**REPUBLIC STEEL CORPORATION,
United States Steel Corporation, et
al., Plaintiffs,**

**v.**

**UNITED STATES of America and
United States International Trade
Commission, Defendants,**

**and**

**Companhia Siderurgica Paulista (COSI-
PA), et al., Pohang Iron and Steel Co.
Ltd., et al., Defendant-Intervenors.**

**Consolidated Court No. 82–03–00372.**

United States Court of
International Trade.

July 11, 1984.

Donovan, Leisure, Newton & Irvine, New York City (Pierre F. de Ravel d'Esclapon, New York City, of counsel), as amicus curiae for Sacilor, Acieries et Laminoirs de Lorraine.

Cravath, Swaine & Moore, New York City (Alan J. Hruska, New York City, of counsel), for plaintiffs Republic Steel Corp., Inland Steel Company, Jones & Laughlin Steel Inc., National Steel Corp., and Cyclops Corporation.

Law Dept. of United States Steel Corporation (D.B. King, J.J. Mangan, C.D. Mallick, L. Ranney and P.J. Koenig, Pittsburgh, Pa., of counsel), for plaintiff United States Steel Corporation.

Office of the General Counsel, International Trade Commission (Michael H. Stein, General Counsel; Michael P. Mabile, Asst. General Counsel; Catherine R. Field, Washington, D.C., Attorney), for federal defendants.

Wald, Harkrader & Ross, Washington, D.C. (Christopher Dunn and Vaughan Finn, Washington, D.C., of counsel), for defendant-intervenors COSIPA and USIMINAS.

Daniels, Houlihan & Palmeter, Washington, D.C. (N. David Palmeter, Daniel Cameron and Miriam Cutler, Washington, D.C., of counsel), for defendant-intervenors Pohang Iron and Steel Co., Ltd., and Union Steel Mfg. Co., Ltd.

Bredhoff & Kaiser, Washington, D.C. (George H. Cohen, Robert M. Weinberg and A. Richard Feldman, Washington, D.C., of counsel), and Carl B. Frankel, Pittsburgh, Pa., Associate General Counsel, United Steelworkers of America, for amicus curiae United Steelworkers of America, AFL–CIO–CLC.

WATSON, Judge:

This consolidated judicial review involves seven instances in which countervailing duty investigations of imported steel products came to an end because the International Trade Commission (ITC) found that there was no reasonable indication of mate-

rial injury or threat of material injury from importations of those products.[1]

The ITC made these preliminary determinations in February and June of 1982 pursuant to section 703(a) of the Trade Agreements Act of 1979 (the Act) (19 U.S.C. § 1671b(a)).[2]

These seven determinations affected seven kinds of steel products, coming from three countries, Brazil, Spain and Korea.[3]

It is important to add that in February of 1982, the ITC had found that, in the case of five of these products, imported from other countries, there was a reasonable indication of material injury.[4]

In support of its determinations that there were no reasonable indications of material injury or threats of injury in the seven cases under review here, the ITC relied on one or more of the following reasons:

(a) low volume of importations

(b) declining volume of importations

(c) low penetration (low percentage of domestic consumption)

(d) declining penetration

(e) no evidence of underselling

(f) no evidence of price suppression or depression

(g) no confirmed lost sales

(h) healthy condition or relatively healthy condition of the domestic industry

In this review the Court finds that the ITC erred in three respects.

---

1. The seven determinations were the following:
   1. *Carbon Steel Structural Shapes from Brazil,* Inv. No. 701–TA–118 (Preliminary), USITC Pub. No. 1221 (February, 1982), 47 Fed.Reg. 9100 (March 3, 1982)
   2. *Hot-Rolled Carbon Steel Bar from Brazil,* Inv. No. 701–TA–126 (Preliminary), USITC Pub. No. 1221 (February, 1982), 47 Fed.Reg. 9101 (March 3, 1982)
   3. *Cold-Formed Carbon Steel Bar from Brazil,* Inv. No. 701–TA–135 (Preliminary), USITC Pub. No. 1221 (February, 1982), 47 Fed.Reg. 9104 (March 3, 1982)
   4. *Hot-Rolled Carbon Steel Sheet from Spain,* Inv. No. 701–TA–156 (Preliminary) USITC Pub. No. 1255 (June, 1982), 47 Fed.Reg. 26040 (June 16, 1982)
   5. *Hot-Rolled Alloy Steel Bar from Spain,* Inv. No. 701–TA–161 (Preliminary), USITC Pub. No. 1255 (June, 1982), 47 Fed.Reg. 26043 (June 16, 1982)
   6. *Cold-Formed Alloy Steel Bar from Spain,* Inv. No. 701–TA–163 (Preliminary), USITC Pub. No. 1255 (June, 1982), 47 Fed.Reg. 26045 (June 16, 1982)
   7. *Cold-Rolled Carbon Steel Sheet from Korea,* Inv. No. 701–TA–172 (Preliminary), USITC Pub. No. 1261 (June, 1982), 47 Fed. Reg. 28481 (June 30, 1982)

2. § 1671b. **Preliminary determinations**
   **(a) Determination by Commission of reasonable indication of injury.**
   Except in the case of a petition dismissed by the administering authority under section 702(c)(3) [19 U.S.C. § 1671a(c)(3)], the Commission, within 45 days after the date on which a petition is filed under section 702(b) [19 U.S.C. § 1671a(b)] or on which it receives notice from the administering authority of an investigation commenced under section 702(a) [19 U.S.C.

§ 1671a(a)], shall make a determination, based upon the best information available to it at the time of the determination, of whether there is a reasonable indication that—
   (1) an industry in the United States—
     (A) is materially injured, or
     (B) is threatened with material injury, or
   (2) the establishment of an industry in the United States is materially retarded,
by reason of imports of the merchandise which is the subject of the investigation by the administering authority. If that determination is negative, the investigation shall be terminated.

3. The Brazilian and Spanish products were among those included in petitions filed in January of 1982. The challenged determinations of "no reasonable indication of injury" were made in February, 1982 for the Brazilian products. For the Spanish products, the determinations were made in June, 1982 because the Spanish investigations moved to a later schedule when Spain became a "country under the Agreement," and therefore became entitled to an injury determination. The determination as to the Korean product was made in June, 1982 from petitions filed in May, 1982.

4. Those five steel products were hot-rolled sheet, cold-rolled sheet, carbon steel structurals, hot-rolled carbon bars and cold-formed carbon bars. The countries from which importations were found to be presenting a reasonable indication of injury were the Federal Republic of Germany and France (hot and cold-rolled sheet and structurals); Italy (hot and cold-rolled sheet); Belgium (hot-rolled sheet and structurals); the Netherlands (hot and cold-rolled sheet); Luxembourg (structurals) and the United Kingdom (hot-rolled and cold-formed carbon bars).

First, with respect to those five products whose importations could possibly contribute to material injury by adding to the effects of importations of those products from *other* countries, the ITC erred by considering each of those products separately from each country. This error affected the preliminary determinations listed in footnote 1, except for Nos. 5 and 6. For those five products the criterion for finding a reasonable indication of material injury should have been simply whether all subsidized or allegedly subsidized products of the same type could exert a combined effect on the domestic industry. The ITC should have considered only the cumulated sum of importations of a particular product. In these preliminary determinations, the factors listed above could be relevant only for the cumulated amount as a whole.[5] For importations from a single country they were irrelevant.

Second, with respect to products which were not initially subject to the necessity of cumulated consideration, the ITC erred by applying too stringent a standard to the information before it and by weighing conflicting evidence concerning the listed factors. This error affected the preliminary determinations numbered 5 and 6 in footnote 1. For those products, the presence of any information from which the possibility of material injury could be reasonably inferred, was sufficient to present a reasonable indication of injury.

Third, with respect to the possibility of the existence of threats of material injury, the ITC also applied too stringent a standard and did not direct its preliminary inquiries to the proper factors.

These three errors will be discussed separately.

## I

On the subject of cumulation the parties have presented a three-sided argument. In essence, plaintiffs argue that the cumulation of importations of a product from different countries is mandatory and perma-

nent. The intervenors argue that it is unlawful. The ITC argues that it is discretionary.

Plaintiffs claim that for the purposes of a countervailing duty investigation all contemporary, subsidized or allegedly subsidized, competitive importations of a product, must be cumulated and considered as a unit for purposes of determining whether the domestic industry is being materially injured.

Plaintiffs urge that had the ITC done so, it would have been obvious that, given an indication of injury from one or more of those other sources, the allegedly subsidized imports involved here, in any amount, must be added to the same finding. Plaintiffs further argue that if importations from any of those other sources were finally found to be the cause of material injury, any other contemporary importations must *also* be subject to the same finding.

The defendant intervenors, representing Brazilian producers and Korean producers, argue that cumulation, as envisioned by plaintiffs, is not required by the countervailing duty law and would, in fact, violate the law and the international agreements that the law was intended to implement. They assert that this violation would occur if the ITC was to find injury from a country's products without proof of causation.

The ITC argues that it properly exercized its discretion to consider the effect of importations of these products individually, as importations from separate countries. It further contends that, in each determination, its evaluation of the information gave a rational and lawful basis to the determinations that there were no reasonable indications of injury from importations of these products.

More specifically, on the issue of cumulation, the ITC maintained that these importations "could not conceivably have contributed to material injury." 47 Fed.Reg. at 9091. It further stated that "the factors and conditions of trade" must show the relevance of cumulation to the determina-

---

**5.** A special problem involving factor (h) is discussed *infra* in Part II of the opinion.

tion of injury. These factors were stated to include the following:
— volume of subject imports
— trend of import volume
— fungibility of imports
— competition in markets for the same end users
— common channels of distribution
— pricing similarity
— simultaneous impact
— any coordinated action by importers [6]

■ In this judicial review the Court finds that the contributing effect standard is incorrect for the preliminary determination of whether there is a reasonable indication of material injury from importations originating from more than one country. The Court finds that when there is alleged to be material injury caused by importations from more than one country, the contributing effect standard is proper only for a *final* determination of injury, and then only in a manner which is consistent with the use of cumulation in the first instance.

The Court's conclusions are based on the purposes of the countervailing duty law, the standard established in the statute for the ITC's preliminary determination, the legislative history pertaining thereto, the necessity for internal consistency in the law, and the harmonization of the law with the international agreement it was intended to implement.

■ Cumulation is essential to the investigation of injury, and by extension, essential to the enforcement of the countervailing duty law, in two important situations. The first occurs when a number of subsidized sources, no one of which could injure the domestic industry by itself, combine to do injury to the industry. The second occurs when a subsidized source, again not sufficient individually to cause injury to the industry, adds to the injury caused by larger sources. If the countervailing duty law is not administered to take combined or exacerbating effects into account, then it is not being administered reasonably and its fundamental purpose is not being effectuated.

The ITC has not proposed to apply its "contribution" standard for cumulation to cases in which importations are originating from more than one producer in a *single* country. These producers are treated as a unit. It is inconsistent for the ITC to treat importations coming from more than one country in a different manner. For the purposes of determining the *possibility* of material injury, distinctions based on the particular sources of importations are immaterial.

For the making of a determination as to whether there is a reasonable indication of injury from a number of different sources, the contributing effect standard for each separate source is too stringent. Cumulation has to be done without any evidence of the specific causal effect of a segment of importations from a particular country. In the beginning of the ITC's role in these proceedings, it is only the entire mass which must display some possibility of injury, not the individual components of the mass. It must be understood that when the Court speaks of a multiplicity of sources having a combined effect, the "contribution" of a particular source of importations is what is required to make it a cause of material injury *in the final sense*. The maximum ultimate effect of a segment of subsidized importations from one of many countries is its contribution to an injury (if the combined results affect the "industry"). For this reason, it follows that if the ITC asks that a particular segment from one country be shown to contribute to injury *as a condition* to being considered or cumulated with others, i.e., as a condition for being investigated, it is asking for a *final* showing of injury, not an *indication* of injury.

**6.** See also, *Certain Steel Products from Spain,* Inv. Nos. 701–TA–155–163 (Preliminary) USITC Pub. No. 1255, at 8 and .n. 15; *Certain Steel Products from the Republic of Korea,* Inv. Nos. 701–TA–170–173 (Preliminary) USITC Pub. No. 1261 (1982) at 5 and n. 13.

Moreover, cumulation, aside from operating in the absence of direct proof of causation, cannot depend on the *volume* or *trend of volume* of a particular segment of importations. The concept of cumulation is specifically needed for instances when the individual segment may only have sufficient size to adversely affect a single member of the industry. The trend of volume has no bearing on the possibility of such an effect. This effect alone may not be sufficient to support a finding of injury to an industry, but it *will* be sufficient to support a final finding of injury which includes that segment if, taken together with other effects, "industry-wide" injury is caused or exacerbated. It follows that if the ITC uses volume or trend as a condition for investigation, it is ignoring the possibility that, even the smallest volumes or declining trends can have a *contributing* effect in the final analysis, after the matter has been properly investigated. For this reason, when cumulation is appropriate there can be no application of the rule of *de minimus*, and no negative inferences from volume or trend.

The Court holds that the proper test for cumulation is whether subsidized or allegedly subsidized imported products are competing with the product of a domestic industry during a period when the effect of these importations is being felt by the domestic industry.

This standard is the only reasonable means of insuring that there is an investigation of the possibility that segments of subsidized importations may be contributing to, or exacerbating, an injury to a domestic industry.

Up to this point, the Court has stressed the necessity of cumulation and has identified the criterion of competitiveness as the standard for cumulation. The next question is whether cumulation can lead to a final injury determination for importations from a given country, without the necessity of a finding that importations from that country were a specific cause of injury.

On this issue the Court holds that cumulation, as important as it is to the *investigation* of injury, cannot, in the end, completely eliminate the need for a causal connection between importations from a country and injury to a domestic industry. The controlling legal consideration is that an injury determination was added to our countervailing duty law to implement the Subsidies Code, an international agreement.[7] The injury determination is something which individual countries, the United States among them, have agreed to make a condition of the assessment of countervailing duties on each other. Common principles of fairness dictate that the final injury determination must be based on some factual connection between the imports from a specific country and an aspect of the injury to the domestic industry.

The material injury test for products of other countries was referred to by the Senate Committee on Finance as "the most conspicuous change in current law required

7. A few of the relevant provisions, with footnotes omitted, read as follows:

AGREEMENT ON INTERPRETATION AND APPLICATION OF ARTICLES VI, XVI AND XXIII OF THE GENERAL AGREEMENT ON TARIFFS AND TRADE
(as reprinted in the Message from the President of the United States, Transmitting THE TEXTS OF THE TRADE AGREEMENTS NEGOTIATED IN THE TOKYO ROUND OF THE MULTILATERAL TRADE NEGOTIATIONS, PURSUANT TO SECTION 102 OF THE TRADE ACT OF 1974)
PART I
Article 1—*Application of Article VI of the General Agreement*

Signatories shall take all necessary steps to ensure that the imposition of a countervailing duty on any product of the territory of any signatory imported into the territory of another signatory is in accordance with the provisions of Article VI of the General Agreement and the terms of this Agreement.

\*   \*   \*   \*   \*   \*

Article 6—*Determination of injury*

\*   \*   \*   \*   \*   \*

4. It must be demonstrated that the subsidized imports are, through the effects of the subsidy, causing injury within the meaning of this Agreement. There may be other factors which at the same time are injuring the industry, and the

by the agreements...." [8] It must be given the fullest possible meaning consistent with its importance in the international agreement and the constraints of our law.

Our law does not go so far as to require that the *subsidy itself* be shown to be the cause of injury, but it does honor the Subsidies Code to the extent that the injury must be connected to importations from a country, which importations have benefited from a subsidy.[9]

For the ultimate enforcement of such a law, the Court distinguishes between evidence such as the behavior of supply and demand curves and the theoretical effect of increases in supply on prices (which may be sufficient to show a reasonable indication of injury), and evidence of specific actions and reactions occurring in the marketplace. The law is written to place final reliance on the detection of verifiable events. This is the focus of the detailed elements which must be considered by the ITC under 19 U.S.C. § 1677(7) in making an injury determination. Reliance on concrete evidence and verifiable events benefits all parties. It prevents preordained, formulated results of all types.

At this point the Court has expressed the necessity of cumulation and the necessity of a finding of causation. These potentially contradictory demands are reconciled by operating at different stages of the investigation.

Cumulation operates on its own terms at the preliminary determination to require the consideration of the combined effect of all competitive, subsidized or allegedly subsidized importations of a particular product. It operates at the final determination only in conjunction with findings of contribution to injury from the products of particular countries. This vital distinction is grounded in the statutory language, and in the extensive legislative history, both of which indicate an extremely low threshold

for finding a reasonable indication of injury.

The "reasonable indication" determination is the second of five stages of decision in the normal investigation. It is preceded by the review of the sufficiency of the petition which is conducted by the International Trade Administration of the Department of Commerce (ITA) under § 702(c) of the Act (19 U.S.C. § 1671a(c)). It is followed (if the ITC finds a reasonable indication of injury) by the preliminary and final subsidy determinations of the ITA and then, (if the final subsidy determination is affirmative) by the ITC's final injury determination.

In the opinion of the Court, this first determination by the ITC is part of a two-step decision on whether a full-fledged investigation should take place. In functional terms it stands as part of the low threshold to the later investigation of subsidy and injury. It is not a miniature investigation of injury. This standard resembles the low threshold of the ITA decision on the sufficiency of the petition.

To begin with, the language used in the statute to describe the threshold requirement is extremely flexible. It calls only for a "reasonable indication." The word "indication" suggests only the barest clues or signs needed to justify further inquiry. The use of the "reasonable" standard suggests that, in the case of a multiplicity of allegedly injurious importations, it is too much to expect firm proof with respect to all.

In connection with the standard for this determination the House Committee on Ways and Means stated that a reasonable indication will exist in "each case in which the facts reasonably indicate that an industry in the United States could *possibly* be suffering material injury...." [emphasis

---

injuries caused by other factors must not be attributed to the subsidized imports.

**8.** S.Rep. No. 96–249, 96th Cong., 1st Sess. (1979) 38, U.S.Code Cong. & Admin.News 1979, 381, 424.

**9.** On this point it must be noted that Congress did not give a complete implementation to the International Antidumping Code. See, S.Rep. No. 96–249, 96th Cong. 1st Sess. (1979) 40.

supplied] House Rep. No. 96–317, 96th Cong. 1st Sess., 52.

In more extensive remarks, the Senate Committee on Finance noted that this determination by the ITC, together with the sufficiency determination of the ITA, implemented Article 2(4) of the Agreement On Interpretation And Application Of Articles VI, XVI And XXIII of the General Agreement on Tariffs and Trade.

> Before a countervailing duty investigation is initiated, Article 2(4) of the Agreement requires consideration whether both a subsidy and injury exist. The petition determination by the authority under section 702(c) and the determination by the ITC under section 703(a) will implement that requirement for the United States. S.Rep. No. 96–249, 96th Cong. 1st Sess. 49, U.S.Code Cong. & Admin.News 1979, 435.

The importance of this legislative history is that it indicates that the ITC decision is primarily *part of the decision as to whether an investigation should be initiated.* It is not intended to have the substantive content of the full investigation itself. The implication of this legislative history is that the ITC preliminary determination stands in relatively the same position in the statutory scheme as the ITA sufficiency determination. It should display the same spirit of receptiveness to the initiation of investigations as the ITA sufficiency determination.

Another indication of the law's encouragement of investigations is the statement by the Senate Finance Committee that it "intends the 'reasonable indication' standard to be applied in essentially the same manner as the 'reasonable indication' standard under section 201(c)(2) of the Antidumping Act, 1921 has been applied." S.Rep. No. 96–249 at 49, U.S.Code Cong. & Admin.News 1979, at 435.

That standard was introduced into the antidumping proceedings by the Trade Reform Act of 1974 and was intended merely to weed out those cases which were clearly without merit and which could not possibly deserve further investigation. This limited purpose was amplified in the legislative history of the Trade Reform Act.[10]

The Court is also somewhat influenced by the fact that in the administrative step which comes *after* an ITC finding of reasonable indication of injury, the *ITA*'s function is to determine "whether there is a reasonable basis to believe or suspect that a subsidy is being provided....." § 703(b) (19 U.S.C. § 1671b(b)). The standard of this latter function was characterized by the legislators as "not stringent" and "intended to be lower than the Treasury's standard for preliminary determinations

---

**10.** The relevant portion of the legislative history reads as follows:

> Under the present Act, the Secretary of the Treasury must complete his entire investigation as to sales at less than fair value before the matter can be referred to the International Trade Commission for its injury determination. The Committee felt that there ought to be a procedure for terminating investigations at an earlier stage where there was no reasonable indication that injury or the likelihood of injury could be found. Therefore, the Committee adopted a new provision, section 201(c)(2), which provides for the elimination, at an early stage of the antidumping proceedings, of those cases in which there is no reasonable indication that an industry in the United States is being established, by reason of the importation of the merchandise concerned into the United States. The amendment is designed to eliminate unnecessary and costly investigations which are an administrative burden and an impediment to trade.

> Under the amendment, if the Secretary, in the course of determining whether to initiate an antidumping investigation, concludes that there is substantial doubt as to whether injury under the Act exists, he will forward to the International Trade Commission the reasons for his doubts and any available information and preliminary indications concerning possible sales at less than fair value, including dumping margins and the volume of trade. If the Commission, within 30 days after receipt of such information from the Secretary that there is no reasonable indication that an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States, no further proceedings would be conducted. Otherwise, any investigation then in progress would be continued. S.Rep. No. 93–1298, 93rd Cong. 2d Sess. 170, 171, U.S.Code Cong. & Admin.News 1974, 7186, 7308, 7309.

under current practice." S.Rep. No. 96–249, 96th Cong., 1st Sess. 50, U.S.Code Cong. & Admin.News 1979, 436. In the midst of the receptive standard of the *preceding* determination and the relaxed standard of the *following* determination, it is reasonable to view the first ITC determination as designed only to eliminate those matters in which there is nothing whatsoever deserving investigation.

It must be acknowledged that the same legislative history expects the ITC to conduct a "thorough inquiry" in this preliminary determination. This is tempered however, by recognition that it cannot conduct a full-scale investigation within 45 days and that "the nature of the inquiry may vary from case to case depending on the nature of the information available and the complexity of the issues." At that early stage the thoroughness is for the purpose of deciding whether a possibility of injury exists, not for the purpose of deciding between alternative possibilities.

The Court also notes the statement in the legislative history that the burden of proof is on the petitioner in this phase of the administrative proceeding. In light of all the considerations discussed above, this must mean that petitioner has the burden of providing only what is reasonable to indicate the need for further investigation. In context, this means enough to *raise* the issue of injury, not enough to *resolve* the issue.

Another branch of support for the necessity of cumulation is the fact that a concept of cumulation has been applied in antidumping investigations.[11] In the Court's view this reinforces the necessity of cumulation, preliminarily on the basis of competitiveness, and finally on the basis of contribution to injury. The antidumping law and the countervailing duty law now share the

same injury standard. They ought to share the same necessities which arise in the determination of injury, one of which is the cumulation of importations capable of exerting a combined effect on the domestic industry.

Congress had noted the use of cumulation in antidumping investigations and spoke of it in the legislative history of the Trade Reform Act of 1974 as follows:

A number of cases before the Commission have been concerned with the question of whether imports of comparable articles from different countries should be considered together or cumulated in making injury determinations. The issue arises in several different contexts, *viz:* (1) when Treasury determinations involving comparable imports from two or more different countries are simultaneously submitted to the Commission; (2) when Treasury determinations on comparable imports are submitted to the Commission at different times. Under consistent practice, ... the Commission has considered the combined impact of less-than-fair-value imports in making injury determinations when the facts and economic considerations so warrant. Such result does not follow as a matter of law; it follows, on a case by case basis, only when the factors and conditions of trade show its relevance to the determination of the injury. S.Rep. 93–1298, 93rd Cong., 2d Sess. 180 (1974), U.S.Code Cong. & Admin.News 1974, 7317.

In this opinion, the Court is recognizing the necessity of cumulation in countervailing duty investigations. The Court is further clarifying the standards which must govern the use of cumulation in preliminary and final determinations. In doing this the Court notes that cumulation is not

---

**11.** *Pig Iron From East Germany, Czechoslovakia, Romania and the U.S.S.R.,* 33 Fed.Reg. 14664 (1968); *Potassium Chloride From Canada, France, and West Germany,* 34 Fed.Reg. 19003 (Nov. 27, 1969); *Pig Iron From Canada, Finland and West Germany,* 36 Fed.Reg. 11835 (June 19, 1971); *Large Power Transformers From France, Italy, Japan, Switzerland and the United King-* *dom,* 37 Fed.Reg. 8136 (April 25, 1972); *Primary Lead Metal From Australia and Canada,* 39 Fed. Reg. 2156 (Jan. 17, 1974); *Animal Glue And Inedible Gelatin From Yugoslavia, Sweden, the Netherlands and West Germany,* 42 Fed.Reg. 57565 (Nov. 3, 1977); *Spun Acrylic Yarn From Japan and Italy,* 45 Fed.Reg. 19682 (March 26, 1980).

done automatically as a matter of law. It continues to be a question involving the factors and conditions of trade. But these factors, when it comes to finding a reasonable indication of injury, are only those factors which relate to the competitive nature of the products which are the subject of a petition. Factors of actual causation are properly the subject of a full investigation and enter the equation only if a final determination is needed.

■ In sum, the Court has found cumulation to be necessary for the *meaningful* enforcement of the law and causation to be necessary for the *fair* enforcement of the law. The cumulation of importations from different countries for the purpose of investigation is tempered, in the final stage, by the necessity of finding that products of each country are contributing to material injury.

## II

■ The Court now addresses the remaining two determinations; those in which the issue of cumulation was not the first logical issue.[12] These were the determinations by the ITC that importations of hot-rolled alloy steel bars and cold-formed alloy steel bars from Spain did not present a reasonable indication of injury.[13]

With respect to the hot-rolled alloy bars, the ITC finding was "primarily based" on the "healthy condition" of the domestic industry (USITC Pub. 1255, p. 26) and additionally, on the decline in imports. The finding as to the cold-formed alloy bars, was based on the "relatively healthy condition" of the industry and "no reasonable indication of a causal relationship" between the decline of the industry's economic indicators and the small volume of Spanish imports.

These determinations were not made in accordance with law, because the ITC should not be engaged in a determination of whether an industry is "healthy." A

"healthy" industry can be experiencing injury from importations and an "unhealthy" industry can be unaffected by importations. The purpose of the ITC's investigation is to determine whether imports are a cause of any effect on an industry which could amount to "material injury." This is the clear meaning of the detailed statutory instructions on the weighing of injury contained in 19 U.S.C. § 1677(7).

The ITC focused on a concept of health which is not meaningful, other than as alternative language for the conclusion that importations could not possibly cause material injury. Even if the Spanish alloy bar determinations are read as properly focused determinations that there was no reasonable indication of injury, they are not in accordance with the law. They were made by weighing conflicting data, not by looking for whether there was a reasonable indication of injury.

In the case of hot-rolled alloy bars, the economic indicators of the domestic industry showed an improvement in 1981, but this was a decline from the three preceding years; and the improvement was not carried on into the first quarter of 1982, when the over-all decline resumed. The volume of imports showed 11,000 tons in 1978; less than 500 tons in 1979; 1,000 tons in 1980; 5,000 tons in 1981 (1,000 in the first quarter); and 4,000 tons in the *first* quarter of 1982. The import penetration level was four-tenths of a percent in 1978, less than five-hundreths of a percent in 1979 and 1980, two-tenths of a percent in 1981 (one-tenth of a percent in the first quarter) and seven-tenths of a percent in the first quarter of 1982.

The court recites these figures, not to engage in an evaluation of economic data, but merely to demonstrate that this data could support different conclusions. If the ITC had not weighed conflicting evidence, there would be some factors to provide probable cause to investigate further. If

---

**12.** These are the determinations numbered 5 and 6 in footnote 1.

**13.** At the time the Spanish alloy bar determinations were made there were no prior determinations indicating injury from importations of alloy bar from other countries.

reasonable arguments can be made concerning the ITC's weighing of conflicting data then *there must have been sufficient information to pass the low threshold of a reasonable indication of injury.*

■ The low threshold of the ITC's determination of whether there is a reasonable indication of injury is the unavoidable and logical consequence of the completely different nature of the two stages of the ITC's involvement in these proceedings. *The object of these determinations should have been simply to find whether there were any facts which raised the possibility of injury. The resolution or interpretation of conflicting facts should have been reserved for a possible final injury determination.*

The fundamental point which the Court emphasizes is that the standard claimed by the ITC for its preliminary determination of reasonable indication of injury, is actually the proper standard for a final determination. If applied at this early stage it would create a serious imbalance in the operation of the law.

It is true that under 19 U.S.C. § 1677(7) the ITC is required to consider a variety of factors in both its preliminary and final determinations. But this does not mean that these factors are to be examined in the same way in both stages. In fact, they must be examined differently, *because they are being examined for different purposes.*

In the first determination, they are being examined to see if there are any elements at all which raise the possibility of injury—not whether a balancing or weighing of conflicting elements supports that conclusion. In the final determination the ITC is exercising the full measure of its expertise and discretion to weigh and evaluate conflicting evidence.

This crucial distinction must be maintained in order for the law to operate fairly and effectively.

### III

■ Threat of material injury is a separate matter from material injury itself. In these cases the ITC also found that there was no reasonable indication of a *threat* of material injury. This determination is challenged by plaintiffs as being the result of a failure to consider the appropriate information or to conduct its inquiry for information in the proper manner.

For the most part, (with the exception of the Korean matter), these determinations appear to have relied on data regarding import volume and trend. This was the same data which led to the determinations that there was no reasonable indication of actual material injury.

This information is not the logical focus of an investigation into threat of injury. The essence of a threat lies in the ability and incentive to act imminently. This can be investigated by objective measurements of production capacity, available inventory, export markets and recognizable factors of economic motivation. Most of this information is normally within the knowledge of the producers and it is unfair to penalize the petitioners for the absence of this information, particularly if it has been requested of foreign respondents and has not been supplied.

In addition, the nature of the subsidy plays an important role, with an obviously significant incentive arising if the subsidy happens to be an *export* subsidy. "Information" as to the nature of the subsidy must be considered by the ITC under the compulsion of 19 U.S.C. § 1677(7)(E).[14] The ITC's argument that it has no such "information" at the preliminary stage is disingenuous. At that early stage, it has to work with the subsidy allegations of the

---

**14.** 19 U.S.C. § 1677(7)(E) reads as follows:
In determining whether there is a threat of material injury, the Commission shall consider such information as may be presented to it by

the administering authority as to the nature of the subsidy (particularly as to whether the subsidy is an export subsidy inconsistent with the Agreement) provided by a foreign country....

petition as an element in the search for the possibility of a threat.

In short, the Court is persuaded that just as the meaningfulness of the law depends on a low threshold for a reasonable indication of an actual material injury, it depends on a low threshold for a reasonable indication of threat of injury. Moreover, because the evidence needed to support the indication of threat is more difficult to obtain than evidence of actual injury, it is reasonable to predicate the need for further investigation of a threat on the barest indications.

In the case of Korea, the factor of capacity *was* examined, and the bankruptcy of one producer was noted. But the conclusion was the result of weighing conflicting evidence, not a finding of the complete absence of the possibility of threat. Thus, the factors of alleged export subsidies, the possible excess capacity of other producers, and the expression of export intentions recorded by ITC investigators were not considered.

In these respects, the ITC's determinations that there were no reasonable indications of threats of material injury in these matters were not in accordance with the law.

### IV

The conclusions reached by the Court require that these determinations be remanded to the ITC on the following terms:

The five determinations numbered 1, 2, 3, 4 and 7 in footnote 1 should have been made by cumulating the involved product with the same product, since found to be presenting a reasonable indication of injury. They are remanded for the ITC to make and publish a determination of reasonable indication of injury.

The two determinations regarding alloy bar from Spain numbered 5 and 6 in footnote 1, are remanded for the making of a

new determination of whether there is a reasonable indication of injury, consistent with the standard enunciated in this opinion. The Court notes that for the determination in those two cases, it will *not* order that they be considered cumulatively with earlier alloy bar importations from other countries which the ITC found *not* to be presenting a reasonable indication of injury.[15]

For all the products involved here the Court will require the ITC to make a preliminary determination of whether there is a reasonable indication of a threat of material injury, consistent with this opinion.

The ITC shall have 45 days from the date of this opinion to comply with these instructions.

---

15. The earlier negative determinations were preliminary determinations regarding hot-rolled alloy bar from France, Italy, United Kingdom and West Germany and cold-formed alloy steel bar from Belgium, France, Italy, United Kingdom and West Germany. 47 Fed.Reg. 9103 and 47 Fed.Reg. 9105.