**AMERICAN GRAPE GROWERS ALLIANCE FOR FAIR TRADE, et al., Plaintiffs,**

v.

**UNITED STATES, et al., Defendants.**

84–04–00575.

United States Court of International Trade.

Aug. 8, 1985.

Heron, Burchette, Ruckert & Rothwell, Washington, D.C. (Thomas A. Rothwell, Jr. and James M. Lyons), Washington, D.C., for plaintiffs.

Michael P. Mabile, Asst. Gen. Counsel and Wayne Herrington, Washington, D.C., for defendant U.S. Intern. Trade Com'n.

Plaia & Schaumberg, Washington, D.C. (Herbert C. Shelley, Tom M. Schaumberg, Joel D. Kaufman and George W. Thompson, Washington, D.C.), for defendant intervenor Joseph E. Seagram and Sons, Inc.

Covington & Burling, Washington, D.C. (Harvey M. Applebaum, O. Thomas Johnson, Jr. and David R. Grace, Washington, D.C.), and Wiggin & Dana, New Haven, Conn. (Shaun S. Sullivan and Mark R.

Kravitz), New Haven, Conn., for defendant intervenor, Banfi Products Corp.

Barnes, Richardson & Colburn, Washington, D.C. (James H. Lundquist, Gunter von Conrad and Matthew J. Clark, Washington, D.C.), for defendants-intervenors Moet-Hennessy U.S. Corp., Schieffelin and Co., and I.L. Ruffino.

Schreiber & MacKnight, Washington, D.C. (William B. Schreiber and Louis Armand Dejoie, Washington, D.C.), for defendant-intervenor Wellington Importers, Ltd.

Law Offices of Max N. Berry, Washington, D.C. (Max N. Berry and Marsha A. Echols, Washington, D.C.), for amicus curiae French Federation of Wein and Spirits Exporters.

*Opinion and Order*

WATSON, Judge:

This action challenges determinations made by the International Trade Commission (ITC) at the first stage of its involvement in countervailing duty and antidumping duty investigations of table wine from France and Italy.[1] The ITC found, under the authority of sections 703(a) and 733(a) of the Tariff Act of 1930, (19 U.S.C. § 1671b(a) and § 1673b(a))[2] that there was no "reasonable indication" that the imports of table wine, allegedly subsidized and sold here at less than fair value, were the source of material injury or threat of material injury to an industry in the United

States. That finding terminated the investigations.

The matter is before the Court on cross-motions for summary judgment under Rule 56, which, for all practical purposes, are the same as motions for judicial review on the administrative record under Rule 56.1. There are no factual issues which are material to the making of this decision and the action can be entirely decided on questions of law. The Court finds no need for oral argument.

In this proceeding the Court previously decided that domestic grape growers did not have standing to challenge the determinations and dismissed various plaintiffs from the action.[3]

Two basic issues remain. The first issue is whether or not the ITC should have combined or "cumulated" the imports of table wine from France and Italy, instead of examining them separately. The second issue is whether or not the ITC applied an erroneous legal standard in determining that there was no "reasonable indication" of injury or threat of injury.

On both of these issues the Court concludes that the ITC actions were not in accordance with the law.

The cumulation issue has a logical priority in the sense that the determination of the corpus of imports subject to investigation ought to come before consideration of whether there is a reasonable indication that a domestic industry is being injured or threatened with injury by that corpus. For

1. Investigations Nos. 701–TA–210 and 211 (Preliminary) and 731–TA–167 and 168 (Preliminary), USITC Public. 1502, 49 Fed.Reg. 10587 (1984).

2. **§ 1671b. Preliminary determinations**
   **(a) Determination by Commission of reasonable indication of injury.** Except in the case of a petition dismissed by the administering authority under section 702(c)(3) [19 U.S.C. § 1671a(c)(3)], the Commission, within 45 days after the date on which a petition is filed under section 702(b) [19 U.S.C. § 1671a(b)] or on which it receives notice from the administering authority of an investigation commenced under section 702(a) [19 U.S.C. § 1671a(a)], shall make a determination, based upon the best information available to it at the time of the

determination, of whether there is a reasonable indication that—
   (1) an industry in the United States—
     (A) is materially injured, or
     (B) is threatened with material injury, or
   (2) the establishment of an industry in the United States is materially retarded, by reason of imports of the merchandise which is the subject of the investigation by the administering authority. If that determination is negative, the investigation shall be terminated.
   [19 U.S.C. § 1673b(a) is an exact parallel provision for antidumping duty investigations.]

3. *American Grape Growers, et. al. v. United States,* 9 CIT ——, (Slip Op. 85–28, March 11, 1985).

this reason, the Court turns first to the ITC's decision not to cumulate the table wines from Italy and France.

That decision was based on a conclusion that the imports from Italy and France did not exhibit a collective "hammering" effect on domestic wine prices. This in turn was based on a finding that the French imports were concentrated in the traditional white wine category while most of the Italian wines were of an effervescent type. In addition, it was considered significant that the imports were generally marketed by separate groups of importers.

The ITC contrasted the wine investigations with a previous steel investigation in which the imports were found to be comparable and competing in the same markets and exhibiting a "hammering" effect. In that investigation the factors considered relevant included "the fungibility of the subject imports, marketing practices of each country, market shares, pricing practices, inventory practices, and the presence or absence of coordinated action."

■ In the first place, the decision not to cumulate was erroneous because it depended on a depth of analysis and specificity of information which is unreasonable to expect, and unlawful to demand, in the preliminary phase of the investigation. This relates generally to the second issue and to the Court's opinion that the ITC has inflated the preliminary determination into an investigative evaluation of conflicting or incomplete material far beyond the intention of the law.

In the second place, even if we were to ignore the involvement in ambiguous factors and the level of complex judgment which the decision to cumulate purportedly requires, the decision must still be consistent with the basic decision as to what is the product subject to investigation and it cannot create a more stringent standard.

It was error for the ITC to make the standard of competition needed to justify cumulation of the imports subject to investigation more rigorous than the standard used for matching the domestic product with the imported product. It was error to use one standard to define the borders of the investigation and another, more stringent standard, to justify combined analysis of the effect of articles already within those borders. The definition of "like product" is a key to the lawful enforcement of this law. It is defined as a product like the article subject to investigation. 19 U.S.C. § 1677(10). From that definition flows the identification of the domestic industry as producers of a "like product." 19 U.S.C. § 1677(4).

In making the basic determination that the domestic "like product" was *all* ordinary table wine, the ITC specifically rejected an argument that the "effervescent" Italian wines had no domestic counterpart and should be excluded. This rejection was based on a conclusion that some domestic products were substantially similar and were beginning to compete for the same market.

It is contradictory for the ITC, in the very same stage of the determination, to suddenly develop a distinction based on a putative difference between effervescent table wine and traditional white table wine. The coherence of an investigation depends on a uniform definition of the like product and this definition should not be tampered with unless it is modified due to indisputable preliminary facts, or fully developed final investigative facts. If imported articles match the definition of the "like product" they should be considered together and further distinctions based on national origin or variations in character are artificial and irrelevant.

The ITC made an unassailable determination of what is the "like product." This basic determination used the product subject to investigation to define the industry on whom the effect of that product must be measured. By necessity the definition reflects back to match the imported product subject to investigation. That product is non-premium or "ordinary" table wine, valued at less than $8.00 a gallon, f.o.b. winery.

If the law has any flexibility on this point it moves entirely in the opposite direction. In the absence of a domestic "like product" it covers a domestic product which is "most similar in characteristics and uses" with the article subject to investigation. 19 U.S.C. § 1677(10).

The law also provides for the possibility that data for the domestic "like product" may be embedded in the industry production in such a way that separate data cannot be extracted. In that case the law allows the use of the data for the production of the narrowest range of products which include the like product. *See* 19 U.S.C. § 1677(4)(D). Why would such a law, tolerant of inexactitude in the determination of domestic product lines, display excessive concern for the niceties of competition between imports. It is inconceivable that the law would demand that imports be more competitive with each other than with the products whose producers they are alleged to be injuring. This is particularly true when the ITC has already found that no clear dividing lines can be drawn in making distinctions regarding characteristics and uses between imported varieties of ordinary wine.

The Court emphasizes that it is impossible to believe that Congress wanted varieties of the article subject to investigation to compete with each other to a greater degree than they competed with the like product of the domestic industry. The primary concern of the law is with the effect on domestic industry. If imports fall within the scope of the standards used to express that fundamental purpose the only escape for them is if they do not compete with each other at all. And that circumstance will probably signal some needed adjustment to the definition of like product or will represent the final investigative facts of an unusual commercial situation.

■ The Court has previously set out its understanding of the necessity of cumulation in *Republic Steel Corp. et al. v. United States*, 8 CIT ——, 591 F.Supp. 640, motion for rehearing denied 8 CIT ——, (Slip Op. 85–27, March 11, 1985). The reasoning and language of that opinion is fully adopted and incorporated here. The Court remains of the opinion that the purpose of the law, and the harmonious relationship of its various provisions and procedures, require cumulated consideration of all imports whose effect may be experienced by a domestic industry during the same period of time. This is a fundamental necessity to the meaningful enforcement of the law.

The Court is led to discuss the cumulation provision of the Trade and Tariff Act of 1984, even though it did not control these investigations, because the ITC argues that its determination is consistent with that new law. It would be a great irony if the new law, passed to "ensure that the injury test adequately addresses simultaneous unfair imports from different countries" (H.Rep. 98–725, 98th Cong.2d Sess. 37 (1984), U.S.Code Cong. & Admin. News 1984, pp. 4910, 5164, is read as requiring a higher degree of competition between simultaneous imports than between those imports and the domestic like product. That would amount to the introduction of an *impediment* to cumulation and would be exactly opposite to the expressed intention of the law.

It follows that when the Trade and Tariff Act of 1984 speaks of imported products competing with each other and with products of a domestic industry it is not elaborating a more involved method of cumulation. It is simply stating the common sense standard of competition and allowing a way out for the exceptional situation in which imported products may be in competition with a domestic product but for some special reason are *completely* uncompetitive with each other. There should almost be the simplicity of a mathematical equation: Articles which compete with a like product must compete with each other.

Cumulation should not be avoided by the sort of superficial product distinctions that are made in advertisements. It is always possible to develop rational distinctions between products in terms which ultimately relate to questions of consumer taste. But if such distinctions are treated as creating

noncompeting separate products, the legitimate corpus of articles subject to investigation will be fragmented and the purpose of the law will be frustrated.

. Cumulation is a necessary and unavoidable consequence of the proper enforcement of the laws governing the determination of injury.

■ In this context, in a preliminary determination, it is error to condition cumulation on anything more than the possibility that imports from a given source will participate in a combined injurious effect on domestic industry. It is unreasonable to demand that the products be fungible, unreasonable to require coordinated action and unreasonable at this early stage to engage in the measurement and weighing of a host of conflicting and ambivalent marketing and pricing factors.

The ITC's prefunctory statement that, even if it had cumulated these imports, the analysis would not change, is unreasoned and unsupported and does not merit discussion.

■ In any event, cumulated or uncumulated, the determinations are subject to another error, namely the use of an excessively stringent standard for determining the possibility of injury. The ITC has erroneously used a prohibitively difficult standard for finding a "reasonable indication of injury." It has made the preliminary proceeding a full scale investigation into all aspects of the question of injury. Instead of concentrating at this early stage on the limited, relatively simple question of whether there is a *possibility* of injury, the ITC became involved in the full analysis of complex, conflicting and incomplete data. This inevitably led to contradictions between the conclusions reached and the simple necessities of the law.

In order to reach a conclusion that there is no reasonable indication of injury the ITC has to be able to say, in effect, that the information before it does not raise the possibility of injury to the domestic industry. In that instance what would be needed is a complete justification for terminating the investigation.

There was no justification here. The ITC had before it what it called "conflicting data regarding the financial performance of the domestic industry." It based its determination on a conclusion that, regardless of the financial condition of the domestic industry, a "causation analysis" did not show a reasonable indication of material injury.

This "causation analysis" contains some factors which might support an ultimate finding of injury and certainly raised the *possibility* of injury. Thus, wine imports from Italy accounted for approximately 16 percent of domestic consumption in 1983, and the abstract volume of imports is a named factor whose significance must be considered under 19 U.S.C. § 1677(7)(C)(i) and 19 U.S.C. § 1677(7)(B)(i). But the ITC weighed against that prominent fact the conclusion that Italian imports held a relatively flat share of the domestic market during the relevant period and consisted in major part of an effervescent type. The volume of imports from Italy had risen by 6 percent.

Some Italian imports undersold domestic wines but they were found to "account for an extremely small share." The leading Italian brands were found to be priced higher than the leading domestic brands.

Although the prices of domestic table wines declined during the relevant period and there was evidence that the prices of some major Italian wines declined, the ITC found that it was the domestic wines that initiated the downward pressure on market price.

All of this indicates that the ITC was engaged in a detailed evaluation of conflicting and incomplete evidence and was exercising the full range of its powers of final determination at an improperly early stage of the proceedings. At that stage a petitioner is entitled to have the investigation go forward so long as it has raised the possibility of injury.

In the case of French imports of table wine, their volume rose by 48 percent although the ITC did not find this significant because the ratio of French imports to domestic consumption was "miniscule." That ratio, however was increasing from 3.9 to 5.5 percent during the relevant period. This too shows the ITC resolving difficult questions of measurement and evaluation of conflicting data.

The burden which the ITC seems to be placing on the petitioners is a burden of ultimate proof, which is entirely out of place and unfair at this early stage. If there is a burden at all it is simply the burden of *raising* the issue of injury, not the burden of proving injury.

With respect to the question of whether there was a reasonable indication of a *threat* of material injury the ITC again engaged in a wide-ranging evaluation of conflicting factors, some of which were of questionable relevance.

On the question of "threat" the ITC acknowledged the important fact that Italy and France were experiencing problems of over-production. The ITC did not mention the related and obvious point that France and Italy already had established channels of importation into the United States.

Against the fact of over-production the ITC weighed its finding that the volume of imports had not risen "significantly"— which, aside from being a matter of judgment, is a questionable factor to be considering for a determination that does not necessarily depend on any current importations at all.

The ITC also weighed data showing the imports to be higher-priced than domestically produced wines and found that price and the likelihood of increased domestic demand through the end of the decade would respectively limit importers' ability to increase sales and presumably keep the domestic industries from being injured.

In any event, the Court is at a loss to find any meaningful difference between this determination and a final determination. The ITC has engaged in the measurement, evaluation, and resolution of subtle, conflicting and incomplete information.

Foreign over-production and established importation channels are sufficient to create a possibility of a threat.

Meaningful volumes of importation or rising volumes or increasing market penetration, or underselling, are all signs of a possible connection between imports and injury. Of course it can ultimately be found that these factors do not support a finding that imports are injuring or threatening to injure a domestic industry. But that ultimate determination must not be unjustifiably advanced to a time when the only question is whether the petitioners have a right to further investigation. These preliminary determinations constituted prejudgments of questions which the parties are entitled to have investigated fully and fairly in the stages provided by law.

The Court has analyzed the statutory basis for its decision extensively in *Republic Steel Corp. v. United States, supra,* and incorporates that analysis in its entirety herein.

The laws and their operation are so complicated in their interrelationships that serious imbalance in one part is almost certain to disrupt the entire statutory scheme. The attempt to enlarge the substantive content of these preliminary determinations threatens to make a mockery of the legislative intention that investigations be readily undertaken.

There is one additional legal argument which the Court wishes to address. The ITC argues that its position is supported by the decision of the Court of Appeals for the Federal Circuit in *United States v. Roses Incorporated,* 706 F.2d 1563 (1983) and asserts that the decision of the Appellate Court sanctions the weighing of conflicting evidence even at the very earliest stages of the receipt of the petition by the Department of Commerce. This argument overstates the holding of the case.

The opinion of the appellate court did not grant a broad license to the agency to

weigh conflicting evidence at all preliminary stages. Properly read, the decision approves the use of indisputable matters of public record to assess the sufficiency of a petition. It does not approve the premature making of final determinations or any other distortion of the investigative proceeding.

This Court recognized this acceptable degree of agency discretion when it said in its denial of the government's motion for rehearing in the *Republic* case that the ITC might properly conclude that a reasonable indication of injury was lacking if the petitioner's information was in conflict on essential points with matters of public record. But when the ITC becomes involved in the full use of its investigative expertise and begins to weigh conflicting evidence and evaluate alternative predictions it is no longer overseeing a low threshold. It is raising a drawbridge.

In light of the above, plaintiffs' motion for summary judgment is GRANTED. All cross-motions are DENIED. The ITC determinations are reversed and the matter is remanded for proceedings consistent with this opinion.