The **ARMSTRONG RUBBER COMPANY,** Cooper Tire & Rubber Company, and the B.F. Goodrich Company, Plaintiffs,

v.

The **UNITED STATES and United States Department of Commerce,** Defendants.

No. 84-10-01444.

United States Court of International Trade.

March 17, 1988.

---

Frederick L. Ikenson, P.C., Frederick L. Ikenson and J. Eric Nissley, Washington, D.C., for plaintiffs.

Lyn M. Schlitt, General Counsel, Judith M. Czako, Acting Asst. General Counsel and Kristian Anderson, Washington, D.C., for defendant Intern. Trade Com'n.

Arnold & Porter, Thomas B. Wilner, Sukhan Kim, Duane K. Thompson, Washington, D.C., for defendant-intervenors Hankook Tire Mfg. Co., Ltd., et al.

## MEMORANDUM OPINION AND ORDER

WATSON, Judge:

This action began in 1984 when plaintiffs challenged the negative preliminary antidumping injury determination by the United States International Trade Commission ("ITC") in Radial Ply Tires For Passenger Cars From the Republic of Korea, Investigation No. 731–TA–200 (Preliminary), USITC Public 1572, 49 Fed.Reg. 36712 (1984). The determination that there was no reasonable indication of material injury or threat of injury from imports of tires from the Republic of Korea brought an end to the investigation. In the judicial review which ensued, this Court granted plaintiffs' motion for judgment on the record on the ground that the ITC had applied an unlawfully stringent standard in determining whether there was a reasonable indication of material injury or threat of material

injury. *Armstrong Rubber Co. v. United States*, 9 CIT ——, Slip Op. 85–85, 614 F.Supp. 1252. That decision relied on the Court's earlier ruling in *Republic Steel Corp. v. United States*, 8 CIT 29, 591 F.Supp. 640 (1984) reh'g denied, 9 CIT ——, Slip Op. 85–27 (March 11, 1985) dismissed (Order of August 13, 1985, in Consolidated Court No. 82–03–00372) which set out at length this Court's opinion that the preliminary method used by the ITC was erroneous because it weighed conflicting evidence and did not simply decide whether the petitioners' allegations, taken as true, gave a reasonable indication of injury or threat of injury.

In any event, while the Court's *Armstrong* opinion was on appeal the Court of Appeals for the Federal Circuit rejected the rationale of *Republic Steel, supra,* in *American Lamb Co. v. United States*, 785 F.2d 994 (Fed.Cir.1986) and remanded this action for reconsideration in light of that decision. Thereafter, plaintiffs filed a petition for writ of certiorari with the Supreme Court seeking review of a procedural point in the case. Following the denial of the petition for certiorari (—— U.S. ——, 107 S.Ct. 112, 93 L.Ed.2d 60 (1986)), the parties briefed those issues which remained in the case and which had not been earlier reached because of the Court's disposition of the case on the basis of the reasoning in *Republic Steel*.

Plaintiffs claim that the ITC gave unreasonable weight to what it perceived as the generally healthy condition of the domestic tire industry and too little attention to the reasonably indicated effect or threat of the imports. Plaintiffs also claim that the ITC erred in failing to find an indication that the imports were causing downward pressure on the prices of domestic passenger tires in the replacement tire market; that the ITC failed to recognize the indication of threat which arose from economic factors which would force domestic producers to rely more on the replacement market; that in analyzing whether there was any indication of a threat, the ITC erred in using 1984 rather than 1985 and 1986 to assess the condition and performance of the Korean radial passenger tire industry; and finally, that the ITC generally gave unreasonably greater weight to submissions by the importers in preference to submissions by the domestic interests.

Before dealing with these points it is particularly important to explain the standards by which the Court has judged this determination. Now that we know that the ITC can weigh evidence at the preliminary stage and does not have to treat the petition as the equivalent of a complaint facing a motion to dismiss, the reasonableness or unreasonableness of that weighing process is the key. The standard must be one which does not place inordinate and unfair obstacles in the way of a petitioner. Yet it must not allow the fabrication of claims by the combination of ingenious pleading with ephemeral support. In addition, the standard should not allow the ITC to engage in its most discretionary forms of economic analysis, nor obviously, should it require the Court to undertake analysis of that type. In short, unless the standard for reviewing this determination establishes a significantly narrower degree of discretion than that which the ITC has in the making of its final determination, the preliminary determinations of the ITC will be irreversible and judicial review of them will be meaningless.

Fortunately, our appellate court has provided guidance on this matter by suggesting the use of a standard which, for a civil matter, approaches as close as possible to the elimination of doubt. In *American Lamb* the Federal Circuit spoke of two important indicators which permit a negative preliminary determination, first, "clear and convincing evidence" of the absence of a reasonable indication of injury and second, a record which shows that it is "extremely unlikely that evidence of a 'reasonable indication' would be developed in a final investigation." 785 F.2d at 999. Although we are all aware of the logical impossibility of proving a negative, and the absence of any burden of proof on the respondents, for the purpose of strong emphasis, no doubt, the appellate tribunal also referred to "guidelines requiring clear and convincing evidence of '*no* reasonable indi-

cation', and no likelihood of later contrary evidence ..." as providing fully adequate protection against unwarranted terminations. 785 F.2d at 1001. The appellate court further suggested that those guidelines would "weight the scales in favor of affirmative and against negative determinations."

The necessity of adjusting the weighing process to insure that investigations are not aborted when there is any reasonable indication that a full investigation might develop adequate factual support for the petition is further supported by our appellate court's reference back to the very first preliminary antidumping injury determination by the ITC in Butadiene Acrylonitrile Rubber From Japan, Inquiry No. AA1921–INq. 1, USITC Public 727 (1975). In that determination the ITC gave notably greater weight to inconclusive evidence on the likelihood of injury over such relatively stronger factors as price increases by the domestic sellers and a low level of market penetration by the imports. Had the ITC been exercising its normal range of discretion in a final determination, it could most certainly have reached a contrary conclusion.

■ All this serves to point out that even with a certain degree of discretion to weigh the evidence at this most preliminary stage, the weighing must be done with an emphasis on those factors which indicate the need for further investigation. With these points in mind, it can be seen that, although the ITC's weighing of evidence in this matter cannot be faulted if it were to be a demonstration of ultimate expertise, it is defective as a determination whose primary purpose is to fairly eliminate the existence of injury and definitively rule out the usefulness of further investigation. In this stage what is essential is not really the number of those factors which go *against* the indication of injury but rather *how those factors which suggested injury were eliminated as unworthy of further investigation.* Those factors included a decline in gross profits, operating profits, the ratio of operating profits to sales and cash flow, and the suppression of prices in the re-placement tire market, all this during a period of assertedly increasing demand.

■ The only direct reason given by the ITC for discounting those factors was its argument (ITC Opposition Memorandum at 31–35) that the domestic industry preferred to cultivate the original equipment market over the replacement tire market and, most importantly, that the original equipment market historically showed lower profits as new car production increased. This attributes curiously self-defeating behavior to the domestic industry, fails to take into account the fact that the replacement tire market represented approximately 72 percent of the total domestic passenger tire market in 1983 (R.Doc. 4 Confidential at A–21, Table 5) and ignores the fact that many of the domestic manufacturers do not even participate in the original equipment market. The phenomenon of an industry whose health varies inversely with that of an industry which is a major consumer of its products is also so unusual and contrary to ordinary understanding that it cannot be accepted as the foundation of a preliminary determination and as a matter which dooms a petition by clear and convincing evidence at the very start. This unusual and difficult rationale is something which should be determined in a full investigation.

Furthermore, if indeed it was the opinion of the ITC that the developments in the original equipment market would account for the declining factors in the domestic industry's condition without regard to Korean imports, then it seems entirely unreasonable to deny that the domestic industry would become even more heavily reliant on the replacement market and would suffer in that market because that was where the Koreans were concentrating. It seems that rather than deal directly with facts contrary to its thesis of no injury or threat of injury the ITC has arbitrarily chosen explanations of events or eventualities which avoid placing any possible responsibility on the Korean imports.

The ITC also did not deal with one of the most fundamental implications of an independent judgment as to the domestic indus-

try's short-term future by the Automotive Group of Merrill Lynch Capital Markets, Securities Research Division, namely, that competition would intensify as the domestic industry tried to keep capacity utilization up by greater emphasis on the replacement market. [R.Doc. 1 Public at 122–23 (quoting from April, 1984 Merrill Lynch report contained in Exhibit 24 annexed thereto) and R.Doc. 33 Public at 18 and Exhibit G annexed thereto (July 1984 Merrill Lynch report) at 1, 4, 6, 10, 11, and 14.)] The ITC apparently rejected this rather reputable, independent prediction as conjectural at the same time as it gave credence to the purely self-serving projections of the Korean interests.

■ In addition, the period under scrutiny was marked by a Korean government restraint on the exports, imposed just prior to the investigation over the objection of the Korean manufacturers. If anything, that artificial restraint should have generated a particularly strong interest in independent, authoritative projections. As far as the Court can see the petitioners' submissions on the likelihood of further intensification of the price competition in the replacement market was not rebutted by contrary evidence and it was simply unfair and arbitrary for the ITC to treat that prediction as supposition or conjecture under these circumstances.

■ It is the opinion of the Court that the deteriorating financial condition of an industry is not something that can be explained away in these circumstances when the petitioner has presented a reasonable indication of the incursion of the imports under investigation in a major segment of the domestic market and also provided a reasonable indication of price suppression in that segment. A discretionary judgment that the industry still has other positive financial characteristics is arbitrary at this stage of the proceedings when the crucial question is simply whether further investigation is necessary. The ITC's statement that it had been unable to confirm the specific instances alleged of lost revenues and sales falls short of what should be its obligation—to determine in a convincing

way that such instances did not take place and could not be verified in a full investigation. This in itself is an indication of the unsuitability of the preliminary determination to the exercise of the full degree of selectivity and investigative discretion which the ITC has. In this phase the exercise of full discretion is nothing more than arbitrariness with respect to the rejection of reasonably indicated factors which are at least worthy of further investigation and which display classic indications of import-caused price-suppression. (R.Doc. 4. Confidential at A–47—A–51).

■ If we examine some of the details on which the ITC relied in order to absolve the Korean imports from responsibility for price suppression we find a degree of selectivity which is highly arbitrary. For example, the ITC used a March 1981 report by Merrill Lynch to blame the Michelin Tire Co. for price weakness at that time but ignored later Merrill Lynch reports (closer to the period under scrutiny) which named Korean imports as a reason for price suppression in the replacement market and a decline in profitability. [R.Doc. 1 Public at Exhibit 24 (March 1983 issue at 11; September 1983 issue at 1–3; December 1983 issue at 13)]. In these circumstances this went beyond discretion and passed over into arbitrariness. In the same way the ITC's assertions that price pressures in the replacement market were due to domestic firms fighting for increased market share defied the elementary logic that price cutting in a period of insufficient supply is irrational. The reliance on irrational conduct to explain away economic developments which can be analyzed in a more conventional and traditional way is also a sign of arbitrariness in the decisional process.

The same unexplained or inadequately supported selectivity is found in the ITC's threat analysis which the Court reviews from the point of view of what was reasonably indicated as of the middle of 1984. To begin with, as noted earlier, the only evidence derived from independent experts, i.e. those with no interest in the antidumping proceedings, was not given any weight

on the crucial question of what would occur to competition in the replacement market in 1985. This evidence indicated that demand in the original equipment segment and total demand would decline at the same time as additional production capacity would mature; this would intensify the already intense price competition in the replacement market and would increase the effect of dumped imports from Korea. See, R.Doc. 1 Public at 129–30. This evidence was not conjectural; it was of the type on which reliance could properly be placed under the standards set out in *Matsushita Electric Ind. Co., Ltd. v. United States*, 750 F.2d 927 (Fed.Cir.1984) and to reject it in the context of a preliminary investigation, in favor of self-serving predictions by the respondents was arbitrary. At the preliminary stage, the petitioners made more than a showing of a mere "possibility." This was a reasonable indication of a real and imminent threat to the industry in the short term future and its rejection was not grounded in clear and convincing evidence to the contrary.

The ITC's evaluation of the Korean industry's capacity to constitute a threat suffered from the same arbitrary measurement and rejection of factors tending to indicate the existence of a threat. These were factors which met the standard set out in the law. *Alberta Gas Chemicals, Inc. v. United States*, 515 F.Supp. 780, 1 CIT 312 (1981).

The ITC ignored the artificial export limit which was unilaterally imposed by the Korean government, which could have been a perfect explanation for such decline in market penetration and import inventories as had taken place since 1983. It also ignored evidence that there would be increases in Korean production capacity through 1986 (with emphasis on product development for the United States radial tire market); that there were a number of formidable factors operating to discourage increases in Korean domestic tire sales; that an antidumping order had closed off their Australian market, that the Mid–East market was unstable and that the European market was small in comparison to that of the United States. See, e.g., R.Doc. 1 Public at 124–30 and R.Doc. 33 Public at 19–24 and their associated exhibits. Taking a very restrictive view which concentrated primarily on 1984, the ITC emphasized the rather subjective conclusion that the anticipated increase of Korean capacity would be "relatively small" and would not involve the participation of a new manufacturer before 1986. The ITC also stressed its conclusion that the Korean industry was operating at 100 percent of capacity in 1984, that its domestic sales would increase in 1984, and that its exports to Europe would nearly double in 1984. All this was a highly selective emphasis on a few factors in a very limited time-frame and did not approach what the Court would consider to be clear and convincing evidence that a threat from Korean imports had not been reasonably indicated.

The Court notes that it has given no attention to any material in the briefs which refers to matters occurring after the determination and its conclusions are unaffected by what may or may not have actually happened to the domestic industry or to the Korean industry after that point. The motion to strike material from plaintiffs' briefs is therefore denied as moot.

In conclusion, the Court finds that the ITC did not reach its conclusions as to the non-existence of an indication of material injury or threat of material injury by means of clear and convincing evidence. It did so by the exercise of its fullest range of discretion, which, at this stage of the proceeding, when the need for investigation need only be reasonably indicated, amounts to ending the investigation by arbitrary and capricious means.

For these reasons, it is the opinion of the Court that the administrative determination should be reversed and remanded and should remain in that posture for further proceedings consistent with this opinion.