**UNITED STATES INTERNATIONAL TRADE COMMISSION, Petitioner,**

v.

**E. & J. GALLO WINERY, Respondent.**

Misc. No. 85–0298.

United States District Court, District of Columbia.

Dec. 11, 1985.

Charles H. Nalls, U.S. Intern. Trade Com'n, Washington, D.C., for petitioner.

R. Bruce McLean, P.C., Daniel P. Joseph, P.C., Rory F. Quirk, Andra Barmash Greene and Michelle L. Gilbert, Washington, D.C., for respondent.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

The United States International Trade Commission ("ITC") petitioned this Court on October 1, 1985, for a show cause hearing and an expedited order to enforce its September 17, 1985 subpoena directed to respondent, E. & J. Gallo Winery ("Gallo").[1] ITC had issued the subpoena during the course of ITC's preliminary determinations in four countervailing and antidumping duties investigations.[2] The matter came before the Court on October 10, 1985 for an evaluation of the required scope of Gallo's compliance with said subpoena. After a thorough review of the substantial filings and authority provided to the Court by both ITC and Gallo, and a lengthy and detailed oral argument, the Court concluded that Gallo would be required to comply *in toto* with ITC's subpoena by the close of business on October 17, 1985.[3] This opinion sets forth in greater detail the rationale of the Court's bench ruling of October 10.

### Factual Background
### 1984 Investigations

On January 27, 1984, several of Gallo's competitors[4] filed petitions with ITC, pursuant to 19 U.S.C. §§ 1671a(b)(1) and 1673a(b)(1), alleging that imports of non-premium table wine from Italy and France were being subsidized and thereafter sold in the United States at less than fair value.

*Memorandum of Points and Authorities of E. & J. Gallo Winery in Opposition to Petition for Subpoena Enforcement ("Opp."),* at 7. In response to these petitions, ITC initiated "countervailing duties" proceedings, which required in relevant parts as follows:

(a) General rule. If—

(1) ... [ITC] determines that—

(A) a country under the Agreement [on Subsidies and Countervailing Measures], or

(B) a person who is a citizen or national of such a country, or a corporation, association, or other organization organized in such a country,

is providing, directly, or indirectly, a subsidy with respect to the manufacture, production, or exportation of a class or kind of merchandise imported into the United States, and

(2) ... [ITC] determines that—

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury ...by reason of imports of that merchandise,

then there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net subsidy.

19 U.S.C. § 1671 (1979). Concurrently, ITC initiated "antidumping duties" proceedings, which required in relevant parts as follows:

If—

(1) ... [ITC] determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than fair value, and

(2) ... [ITC] determines that

1. Proceedings to enforce compulsory process of ITC fall under the purview of Fed.R.Civ.P. 81(a)(3).

2. These investigations are entitled "Certain Table Wine From the Federal Republic of Germany, France and Italy, Inv. Nos. 701—TA–258–260, 731—TA–283–285 (Preliminary)." *Petition For Expedited Order to Enforce Subpoena Issued by the United States International Trade Commission ("Petition"),* at 1.

3. On said date, ITC filed a notice with the Court which indicated that Gallo had fully complied with both the subpoena and the Court's order.

4. It is clear from both the filings and oral argument in this case that Gallo was not a prosecutorial focus of the 1984 investigations. *See infra* note 8 (1985 Investigations).

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury

. . .

by reason of imports of that merchandise,

then there shall be imposed upon such merchandise an antidumping duty, in addition to any other duty imposed, in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise.

19 U.S.C. § 1673 (1979).

In effectuating its dual investigations, ITC began conducting "preliminary determination[s]" as mandated by 19 U.S.C. § 1671b(a) (countervailing duties) and § 1673b(a) (antidumping duties), which require ITC

within 45 days after the date on which a petition is filed . . . [to] make a determination, *based upon the best information available to it at the time of the determination, of whether there is a reasonable indication that—*

(1) an industry in the United States—

(A) is materially injured, or

(B) is threatened by material injury . . . by reason of the imports of the merchandise which is the subject of the investigation by . . . [ITC]. If that determination is negative, the investigation shall be terminated.

(Emphasis added.)

In implementing its preliminary determinations regarding the effects on the American table wine market of "subsidized" and/or "dumped" non-premium table wines from Italy and France, ITC sent questionnaires to domestic wine producers, importers, and purchasers; and these questionnaires sought rather extensive commercial and financial data from the same. Gallo was required to respond to a thirty-four page "Producer's Questionnaire"[5] by Feb-

ruary 15, 1984, but failed to do so. It is clear from the filings submitted to and the argument heard by the Court that Gallo's chief ground for opposing ITC's 1984 questionnaire was Gallo's fear that business confidential information, critical to Gallo's financial well-being, would be jeopardized. *See Opp.,* at 9.

Because of the forty-five-day lifespans under sections 1671b(a) and 1673b(a), ITC was required to complete its preliminary determinations for the 1984 investigations by March 12 of that year. Gallo and ITC have conflicting versions of what transpired between them shortly before that deadline: whereas Gallo claims that ITC "sent a letter to Gallo stating that it would accept as full compliance with the questionnaire information regarding five delineated items[6] pertaining to Non-Premium Table Wines, being the only information . . . ITC deemed 'absolutely necessary' for its [preliminary] investigations," *Opp.,* at 8 (footnote added), ITC counters that, because it was clear that court enforcement of the subpoena would have come, if at all, only after the March 12 deadline, ITC "compromised and accepted less than all the information originally sought, since it was apparent that, if it did not do so, it would have [had] no information from Gallo at all." *Petition,* at 9–10. In any event, on March 7, 1984—five days before the cut-off date—ITC concluded that there was no reasonable indication that the domestic table wine industry in the United States was being materially injured, or was threatened with material injury, by reason of imports of ordinary table wine from France and/or Italy.[7] In accordance with 19 U.S.C. §§ 1671b(a) and 1673b(a), because the preliminary determinations proved negative, the 1984 investigations were "terminated."

### The 1985 Investigations

On September 10, 1985, seven of Gallo's

---

5. This questionnaire was entitled: "Certain Table Wine From France and Italy." *But see infra* note 10, (1985 questionnaire applied to Federal Republic of Germany also).

6. According to Gallo, the "five delineated items" were "information on production, shipments,

capacity, capacity utilization and profitability of NPTW [*i.e.,* Non-Premium Table Wine] alone...." *Affidavit of Louis Friedman* (Vice-President/Treasurer of Gallo), ¶ 9.

7. *See* Certain Table Wine From France and Italy, USITC Pub. No. 1502, at 10.

competitors,[8] some of whom had initiated the 1984 investigations, filed new petitions with ITC, this time alleging that "an industry in the United States ... [was being] materially injured, or ... [was] threatened with material injury, by reason of imports of table wine from *the Federal Republic of Germany*, France and Italy." *Petition*, at 4 (emphasis added). These filings contended that the table wine in question was either "subsidized or sold at less-than-fair-value prices in the United States." *Id.*

On September 17, 1985, ITC responded to these petitions by initiating the current countervailing and antidumping duties proceedings, pursuant to 19 U.S.C. §§ 1671 and 1673, as amended in 1984[9]. ITC again issued questionnaires to domestic wine producers, importers, and purchasers, this time in the form of administrative subpoenas. *See* 19 C.F.R. § 2078 (1985). Gallo was issued a thirty-three page "Producer's Questionnaire"/subpoena to be complied with by Gallo and received by ITC no later than September 27, 1985.[10] *Petition*, at 10. In anticipation of a recitation of Gallo's primary objection to the first questionnaire, the subpoena "specifically state[d] that confidential information submitted by Gallo in the questionnaire would be treated as confidential by ... [ITC] during the course of the ... preliminary investigations." *Id.* In addition,

> [t]he questionnaire ... specifically stated that, if Gallo indicated that it was an interested party in support of the petitions on which ... [ITC's] preliminary investigations were based, confidential information supplied by Gallo on the domestic prices and cost of production could be released to counsel for parties

to the preliminary investigations under an administrative protective order. *Id.*

Several phone conversations and face-to-face meetings were conducted between Gallo and ITC representatives just before and just after the September 27 return date for the questionnaire, but these negotiations proved unfruitful. In short, Gallo refused to comply with the subpoena. Therefore, ITC, conscious of the time pressures it believed responsible for its inability in 1984 to obtain the information it sought from Gallo, and in anticipation of the forty-five day deadline of October 25, 1985 for its second round of preliminary determinations, filed a petition with this Court on October 1, 1985, requesting both a show cause hearing and an expedited order to enforce its subpoena. The Court conducted such a hearing on October 10, 1985, concluded that Gallo would be required to comply fully with ITC's subpoena by the close of business on October 17, 1985, and issued an order reflecting said conclusion. *See supra* note 3.

### Jurisdiction

Petitioner ITC is an independent administrative agency of the United States Government organized and existing pursuant to 19 U.S.C. § 1330, *et seq.* Under 19 U.S.C. § 1671, ITC is authorized and directed to conduct countervailing duties investigations to determine whether an industry in the United States is materially injured or threatened with material injury because of the sale of subsidized imports in the United States. In addition, 19 U.S.C. § 1673 authorizes and directs ITC to conduct anti-

---

**8.** The petitioners were as follows: American Grape Growers Alliance for Fair Trade; California Association of Wine Grape Growers; Guild Winery and Distilleries; Gibson Wine Company; Allied Grape Growers; Italian Swiss Colony Wines of California, Inc.; and Sun-Diamond Growers of California. *Petition*, at 4. Again, it is clear from both the filings and oral argument that Gallo, at present, is not a "target" of the 1985 investigations. *See supra* note 4 (1984 Investigations).

**9.** The October 30, 1984 amendments to 19 U.S.C. §§ 1671 and 1673 make these provisions appli-

cable to "a class or kind of merchandise imported, *or sold (or likely to be sold) for importation,* in the United States. (Emphasis added). *See supra* 1263–64 for earlier versions of these statutes.

**10.** The 1985 questionnaire, though substantially similar to the 1984 questionnaire, was entitled: "Certain Table Wine From the Federal Republic of Germany, France, and Italy." *But see supra* note 5 (1984 questionnaire limited to France and Italy).

dumping duties investigations to determine whether an industry in the United States is materially injured or threatened with material injury because of the sale of imports in the United States at less-than-fair value. To initiate both countervailing and antidumping investigations, ITC is empowered by 19 U.S.C. § 1671b and § 1673b, respectively, to conduct preliminary determinations.

ITC is aided in its effectuation of preliminary determinations by 19 U.S.C. § 1333(a), which authorizes ITC to obtain by subpoena the production of documentary evidence and the testimony of witnesses related to its inquiries. *See* 19 C.F.R. § 207.8 (questionnaires as subpoenas). Moreover, ITC may require such production from "any place in the United States at any designated place of hearing." 19 U.S.C. § 1333(b).

■ This Court has the power to enforce ITC's subpoena directed to Gallo by virtue of 19 U.S.C. § 1333(b), which provides that ITC "may invoke the aid of any district ... court of the United States ... in requiring the attendance and testimony of witnesses and the production of documentary evidence." Furthermore,

> [s]uch court within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpoena issued to any corporation or other person, issue an order requiring such corporation or other person to appear before ... [ITC], or to produce documentary evidence if so ordered or to give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof.

*Id.* (Emphasis added.) Thus, because the countervailing and antidumping proceedings in question are being conducted in this judicial district by ITC, this Court has the authority and the power to evaluate and enforce, if enforcement is appropriate, ITC's subpoena. *See* 19 C.F.R. § 207.8. *See also* Fed.R.Civ.P. 81(a)(3) (district court may compel witness testimony and document production sought by agency subpoena).

### Standard of Review

ITC argues that "[t]he role of the [district] court in a proceeding to enforce an administrative subpoena is strictly limited." *Petition*, at 14 (citing *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943); *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946)). Conceding that this Court's function is " 'neither minor nor ministerial,' " ITC contends, nonetheless, that "the scope of the issues which may be litigated in an enforcement proceeding is narrow due to the compelling government interest in expeditious investigation of possibly unlawful activity." *Petition*, at 14 (citing *Oklahoma Press*, 327 U.S. at 217, 66 S.Ct. at 509; *FTC v. Texaco*, 555 F.2d 862, 872 (D.C.Cir.) (en banc), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072, *reh'g denied*, 434 U.S. 883, 98 S.Ct. 250, 54 L.Ed.2d 168 (1977)). Thus, ITC maintains that a district court's standard of review applicable to the judicial enforcement of an investigative subpoena is simply as follows: " '[I]t is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and *the information sought is reasonably relevant.*' " *Petition*, at 14 (emphasis added) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950)).

Gallo counters ITC by maintaining that the scope of ITC's subpoena requires *de novo* review by the district court, as opposed to mere "rubber-stamping," because a determination that a particular individual should be required to disclose information may not be committed to a "subordinate administrative or executive tribunal." *Opp.*, at 16–17. Citing, *inter alia, ICC v. Brimson*, 154 U.S. 447, 485, 14 S.Ct. 1125, 1136, 38 L.Ed. 1047 (1894), *United States v. Fitch Oil Co.*, 676 F.2d 673 (Temp.Emer.Ct. App.1982), and *Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1266 (7th Cir.1982), Gallo argues that the district court, as the enforcement mechanism for ITC subpoenas, must guarantee subpoenaed parties procedural due process; so that this Court must therefore "provide adversarial pro-

ceedings and meaningful review of the issues presented." *Opp.*, at 16 and n. 11.

Gallo bolsters its argument for adversarial review by pointing out a distinction between the subpoena enforcement cases cited by and chiefly relied on by ITC in its *Petition*—Labor Department and Federal Trade Commission cases—and the present subpoena enforcement proceeding: "in those cases, the subpoenas could be challenged in administrative proceedings before the agencies there involved in advance of court enforcement. Thus, on a petition for judicial enforcement, the court was in each case actually reviewing an agency record and decision ruling on a challenge to the subpoena." *Opp.*, at 17. Here, Gallo maintains that, because of regulations pertinent to preliminary determinations under 19 U.S.C. § 1671b and § 1673b, ITC "has provided neither any opportunity for Gallo to challenge the scope of the subpoena administratively [*i.e.*, before ITC itself] nor any record that ... purports to explain why the breadth and burden of the subpoena are necessary." *Opp.*, at 18.

 The Court concludes that the appropriate standard of review for the subpoena in question lies in between the positions proffered by ITC and Gallo. Although the "reasonably relevant" standard of *Morton Salt* relied on by ITC, *supra*, applies generally to judicial enforcement proceedings for administrative subpoenas, "this formulation of the rule, standing by itself, is something of an overstatement, for it is also clearly recognized that disclosure may be restricted where it would impose an *unreasonable or undue burden* on the party from whom production is sought." *Dow Chemical*, 672 F.2d at 1267 (emphasis added). On the other hand, although Gallo's distinction regarding the availability, in other subpoena contexts, of agency review—prior to judicial (*i.e.*, Article III) enforcement—is superficially appealing, it must be emphasized that the denial by an administrative law judge ("ALJ") of a mo-

tion to quash an investigative subpoena at the agency level is "not binding on the [district] court as to the questions properly presented." *Id.* This is largely because an ALJ's decision regarding the scope of a subpoena is often made "without the benefit of the extensive affidavits [that may later be] submitted [by subpoena respondents] to the district court." *Id.* at 1267 n. 5.

Accordingly, the appropriate review standard for ITC's subpoena is an intermediate position that recognizes both the "reasonably relevant" element of *Morton Salt* and the "unreasonably or unduly burdensome" element of *Dow Chemical* and similar cases. *See e.g., Oklahoma Press*, 327 U.S. at 208, 66 S.Ct. at 505; *FTC v. Shaffner*, 626 F.2d 32, 38 (7th Cir.1980); *Texaco*, 555 F.2d at 881–82. This approach, hardly a rubber-stamping, will satisfy Gallo's procedural due process concern by providing Gallo with "meaningful review" of the issues presented.

### The Scope of ITC's Preliminary Determinations

1. *Reasonable Relevancy*

Gallo asserts that ITC "has quite clearly failed to demonstrate that its subpoena is reasonable or relevant." *Opp.*, at 24. In making this assertion, Gallo contends that

> ITC's power to obtain information is limited during a preliminary ... [determination]. In fulfilling its statutory mandate during this phase ... *ITC is to consider only whether there is a reasonable indication of injury or threat of injury to a domestic industry.... ITC's sole function at this stage is to determine whether a full investigation should be initiated. In this context, ... ICC has acknowledged in its own regulations that investigative information may not be necessary and the preliminary determination may be made on the best available information.*

*Id.* at 24–25 (citing 19 C.F.R. § 207.17) [11] (emphasis added). In support of its conten-

---

**11.** 19 C.F.R. § 207.17 provides as follows: "[ITC], within 45 days after the date on which a petition is filed ... shall make a preliminary determination *based upon the best information available* to it at that time of whether there is a reasonable indication of injury by reason of imports of the merchandise which is the subject of the investigation...." (Emphasis added.) *See* 19 U.S.C. §§ 1671b(a) and 1673b(a).

tion, Gallo refers this Court to a recent decision of the United States Court of International Trade, *American Grape Growers Alliance for Fair Trade v. United States*, ("*Grape Growers*"), 615 F.Supp. 603, 697 (Ct.Int'l Trade, 1985), which held that where, during a preliminary determination, ITC engages in a detailed evaluation of evidence, it exercises "the full range of its powers of final determination at an improperly early stage of the proceedings." In short, Gallo's position is that ITC seeks too much information "at the preliminary stage in making its determination[s]." *Opp.*, at 25–26. *See also Republic Steel Corp. v. United States*, ("*Republic Steel*"), 591 F.Supp. 640, 647 (Ct.Int'l Trade 1984) (reasonable indication of injury determination not intended to have substantive content of full investigation), *on reh'g*, No. 82–03–00372, slip op. (Ct.Int'l Trade, March 11, 1985). During oral argument, Gallo went so far as to claim that, where an individual or corporation files a petition for countervailing and antidumping investigations with ITC, and that petition contains evidence of injury which could reasonably be expected to be within the petitioner's knowledge, the petition "standing alone" may substantiate a preliminary determination by ITC that there is a reasonable indication of injury for the industry in question and, therefore, a need for further investigation. (Citing No. 82–03–00372, at 3.)

In reality, what Gallo seeks from this Court is an inverse reading of *Grape Growers* and *Republic Steel*, a reading the Court will not adopt. In those cases, the Court of International Trade reversed the decisions of ITC to terminate countervailing and antidumping duties investigations after the preliminary determination stage, because ITC had "erroneously used a prohibitively difficult standard for finding a 'reasonable indication of injury.'" *Grape Growers*, at 607. The Trade Court concluded that, because ITC had conducted full-scale investigations in arriving at the negative preliminary determinations there in question, ITC's decisions were "subject to ... error, namely the use of *an excessively stringent standard* for determining the

possibility of injury." *Id.* (Emphasis added.)

In short, that court did not hold that ITC was limited during a preliminary determination to conducting a superficial investigation; it did not set an upper limit on how detailed ITC's preliminary investigative work may be. The Trade Court was simply making clear that where an individual or corporation petitions ITC to conduct an investigation, "[that] petition is entitled to have the investigation go forward [to a full-scale investigation] so long as ... [the petitioner] has raised the possibility of injury." *Grape Growers*, at 607. *See Republic Steel*, slip op. at 2 (ITC's preliminary determination essentially a decision on whether full investigation should be made; full investigation requires only the passing of "low threshold" of evidence concerning reasonable indication of material injury). Here, Gallo is not among the seven wine companies that petitioned ITC to conduct the current investigations; nor is Gallo appealing to the Trade Court a negative preliminary determination by ITC. Rather, Gallo would have this Court tie the hands of ITC *before* ITC has made its preliminary determinations for the investigations here involved.

This the Court will not do. 19 U.S.C. §§ 1671(a) and 1673(a) and 19 C.F.R. § 207.17 state that within 45 days of the filing of a petition, ICC shall make a preliminary determination "based upon the best information available to it...." This Court lacks the expertise, the facilities, and the manpower to evaluate and delineate exactly what the scope of that information shall be for the current investigations. It is evident, however, that ITC has a substantial number of statutory factors to consider before arriving at preliminary determinations of whether or not material injury or the threat thereof exists in this case: "(B) ... In making its [preliminary] determinations ...,

*[ITC] shall consider*, among other factors—

(i) the volume of imports of the merchandise which is the subject of the investigation,

(ii) the effect of imports of that merchandise on prices in the United States for like products, and

(iii) the impact of imports of such merchandise on domestic producers of like products.

"(C) Evaluation of volume and of price effects. For purposes of subparagraph (B)—

(i) Volume. In evaluating the volume of imports of merchandise ... *[ITC] shall consider* whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

(ii) Price. In evaluating the effect of imports of such merchandise on prices, ... *[ITC] shall consider* whether—

(I) there has been significant price undercutting by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

(iii) Impact on affected industry. In examining the impact on the affected industry, ... *[ITC] shall evaluate all relevant economic factors which have a bearing on the state of the industry,* including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices, and

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

(iv) Cumulation.—For purposes of clauses (i) and (ii), ... *[ITC] shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such imports compete with each other* and *with like products of the domestic industry in the United States market.*

"(D) Special rules for agricultural products.

(i) The Commission shall not determine that there is no material injury or threat of material injury to United States producers of an agricultural commodity merely because the prevailing market price is at or about the minimum support price.

(ii) In the case of agricultural products, ... *[ITC] shall consider* any increased burden on government income or price support programs.

"(E) Special rules. For purpose of this paragraph—

(i) Nature of subsidy. In determining whether there is a threat of material injury, ... *[ITC] shall consider* such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the subsidy is an export subsidy inconsistent with the Agreement [on subsidies and countervailing measures]) provided by a foreign country and the effects likely to be caused by the subsidy.

(ii) Standard for determination. The presence or absence of any factor which ... [ITC] is required to evaluate under subparagraph (C) or (D) shall not necessarily give decisive guidance with respect to the determination by the Commission of material injury.

"(F) Threat of material injury.

(i) In general. In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of any merchandise, ... *[ITC] shall consider, among other relevant economic factors* —

(I) If a subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the subsidy is an export subsidy inconsistent with the Agreement [on subsidies and countervailing measures]),

(II) any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States,

(III) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,

(IV) the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,

(V) any substantial increase in inventories of the merchandise in the United States,

(VI) the presence of underutilized capacity for producing the merchandise in the exporting country,

(VII) *any other demonstrable adverse trends* that indicate the probability that the importation (or sale for importation) of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury, and

(VIII) the potential for product-shifting if production facilities owned or controlled by the foreign manufacturers, which can be used to produce products subject to investigation(s) under 701 or 731 [*i.e.*, 19 U.S.C. §§ 1671 or 1673] or to find orders under section 706 or 736 [*i.e.*, 19 U.S.C. §§ 1671e or 1763e], are also used to produce the merchandise under investigation.

(ii) Basis for determination. *Any determination by ... [ITC] under this subtitle that an industry in the United States is threatened with material injury shall be made on the basis of evidence that the threat of material injury is real and that actual injury is imminent. Such a determination may not be made on the basis of mere conjecture or supposition.*"

19 U.S.C. § 1677(7) (1984) (emphasis added). *See Jeannette Sheet Glass Corp. v. United States*, No. 83–5–00729, slip op. at 1 (Ct.Int'l Trade, August 16, 1985) (record to be considered by ITC in antidumping preliminary determination "consists of not only the petition, but of all the information gathered by ... [ITC] during the [preliminary] investigation period and contained in the administrative record").

■ In light of these factors which ITC must consider and evaluate, ITC's assertion that the standard of reasonable relevance does "not require an agency to present a focused theory of a probable, or even possible, cause arising out of the investigation" is well-taken. *Petition,* at 16. The Court holds, therefore, that "the relevance of the agency's [investigative] subpoena requests may be measured only against the general purposes of its investigation." *Texaco,* 555 F.2d at 874. *See FTC v. Anderson,* 631 F.2d 741, 746 (D.C.Cir.1979). "The court must not lose sight of the fact that the agency is merely exercising its legitimate right to determine the facts...." *Texaco,* 555 F.2d at 874.

In the present case, which involves ITC's preliminary determinations concerning "Certain Table Wine From the Federal Republic of Germany, France, and Italy," ITC's thirty-three page 1985 questionnaire/subpoena seeks fairly detailed information from Gallo under the following headings: "General Questions" (seeking general corporate information from Gallo relating to its importation or manufacture of non-premium table wines and providing definitions of questionnaire terms); "Section A—*Practical Annual Capacity* "; "Section B—*Production* "; "Section C—*End-of-Period Inventories* "; "Section D—*Purchases* "; Section E—*Shipments* "; "Section F—*Employment and Wages* "; "Section G—*Income-and-Loss and Other Financial Data* "; "Section H—*Wholesale-Level Selling Prices of Non-Premium Table Wines* "; "Section I—*Competition from Imports—Price Suppression/Depression* "; "Section J—*Competition from Imports—Lost Sales* "; "Names, addresses, and telephone numbers ... listed in Sections H, I, and J," *supra;* and, "*Additional Questions* " (seeking information concerning Gallo's "two largest suppliers (growers) of grapes during the period January 1983—September 1985" and "the quan-

tity in cases of ... [Gallo's] domestic shipments of non-premium table wine in 1984").

■ Although the Court takes some pause at the breadth of information sought by ITC, *see infra,* discussion, ("2. Burdensomeness/Oppressiveness"), these subject areas sought by ITC are clearly covered by the mandates of 19 U.S.C. § 1677(7)(F), *supra.* In addition, as subsection (F)(ii) of that provision requires, "a [preliminary] determination may not be made on the basis of mere conjecture or supposition." Therefore, *all* of the information sought by ITC from Gallo passes the reasonable relevance test of *Morton Salt, supra;* and, accordingly, the Court accepts ITC's representation that it "is requesting only that information which it believes is necessary for it to make an adequate economic analysis of the domestic industry and determine whether the domestic industry is being injured by reason of imports of the products under investigation." *Petition,* at 16.

### 2. *Burdensomeness/Oppressiveness*

As *Dow Chemical* points out, even though the information sought by an agency in an administrative subpoena is reasonably relevant, "disclosure may be restricted where it would impose an unreasonable or undue burden on the party from whom production is sought." 672 F.2d at 1267. Gallo contends, *inter alia,* that ITC's subpoena "imposes an unreasonable and onerous burden on Gallo to produce information...." *Opp.,* at 19. Gallo raises several arguments in support of its contention that its gathering of information and completion of ITC's "thirty-three page questionnaire will require an inordinate amount of work from Gallo, at a time when the Company's limited staff simply cannot expend this effort without curtailing significant business activities." *Opp.,* at 19. Moreover, Gallo maintains that much of the data sought by ITC is not kept by Gallo in the form required by the subpoena, so that Gallo would be required to "construct that information out of basic financial and production information." *Id.* Furthermore, according to Gallo, the questionnaire "requests information concerning research and development data which have never before been analyzed by Gallo." *Id.*

Gallo spells out three detailed arguments in support of its unduly burdensome contention. First, Gallo claims that

because Gallo's fiscal year ended on August 31, 1985, the limited number of accounting employees who would be able to do the work of complying with the subpoena are already working six days a week, close to 60 hours per week, attempting to close Gallo's accounting books in preparation for the auditors.... If Gallo is required to divert effort to answering ... [ITC's] questionnaire, it will be unable to close its books in time.

Second, Gallo maintains that, because its federal and state tax payments are due on November 15, 1985, Gallo's completion of the questionnaire would force it "to estimate its taxes without all of the information that it usually has for that purpose," so that, in order to avoid a penalty, "Gallo would ... have to overpay its estimated taxes." *Id.* Third, Gallo raises the issue of the current "grape crush," *i.e.,* that time of year in the wine industry "when Gallo should promptly pay the many farmers who supply grapes to ... [Gallo] to maintain the trust and goodwill it has built up over many years. Imposition of the subpoena now would threaten Gallo's ability to maintain those qualities of its business." *Id.*

Although Gallo's arguments lend some support to its assertion that "compliance with the subpoena would directly and adversely affect Gallo's business," *id.* at 21, the Court senses a significant amount of "smoke-screening" on Gallo's part: Gallo appears to be masking its true concern— *i.e.,* the release of confidential business and financial information for the first time in Gallo's history. During oral argument, counsel for Gallo represented to the Court that E. & J. Gallo Winery is a closely held business, owned entirely by members of the Gallo family and controlled by two brothers: Ernest and Julio Gallo. In addition, said counsel informed the Court that the information sought by ITC in its sub-

poena is data that Gallo's owners allocate among six independent accountants; and that these bookkeepers, for the express purpose of maintaining intracompany secrecy (let alone extracompany confidentiality), issue their respective quarterly reports directly and solely to the Gallo brothers.[12]

The Court sympathizes with Gallo's fears concerning the release to ITC of the information sought by the questionnaire/subpoena. However, Gallo is a major producer of wine in the United States; and, as such, Gallo's information would provide ITC with a much more complete basis for making the preliminary determinations in question.[13] Moreover, Gallo enjoys the benefits and protections of the statutory and regulatory framework maintained largely by ITC, so that, in all fairness, Gallo must now swallow the sour grapes with the sweet.

Accordingly, the Court concludes that, in balancing the alleged hardships cited by Gallo against ITC's need (as prescribed by statute) for the information sought, the thirty-three page questionnaire/subpoena, though fairly detailed, is not so unreasonable or burdensome as to warrant said document's non-enforcement.[14] In short, the burden of showing that an agency subpoena is unduly broad or burdensome rests with Gallo, and Gallo has failed to meet this burden. *See United States v. Powell,* 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1971); *Texaco,* 555 F.2d at 882. Furthermore, although a district court should not be reluctant to modify, limit, or deny enforcement of administrative subpoenas that require extensive pro-

duction of documents on grounds of undue burdensomeness if compliance would "unduly disrupt or seriously hinder normal operations of a business," *Texaco,* 555 F.2d at 882, "the mere suggestion ... of possible damage to ... business activities is not sufficient to block an authorized inquiry into relevant matters." *SEC v. Brigadoon Scotch Distributing Co.,* 480 F.2d 1047, 1056 (2d Cir.1973), *cert. denied,* 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974).[15]

The Court recognizes that Gallo is neither a petitioner for nor a current target of the investigations at issue, and that "a court may properly give account to the third-party status of those from whom production is sought in determining whether compliance would constitute an undue burden." *Dow Chemical,* 672 F.2d at 1277. However, the third-party party "factor is far from a decisive one ...," so that in balancing Gallo's status against ITC's need for the reasonably relevant information in question, this factor adds only "[small] weight ... to the side of the scale favoring non-disclosure." *Id.*

Therefore, the Court concludes that ITC's subpoena is enforceable as to Gallo *in toto.* All of the information the subpoena seeks is reasonably relevant under the rationale of *Morton Salt* and none of said information is unduly burdensome or oppressive under that of *Dow Chemical.* Gallo may indeed find it necessary to divert its accounting and other personnel from their normal duties to meet this deadline, but the Court is not convinced that such diversion will have nearly the adverse ef-

---

**12.** As Gallo's counsel represented during oral argument, not even Gallo's general counsel possesses a complete picture of Gallo's operations and business projections.

**13.** During oral argument, ITC's counsel contended that without Gallo's information, ITC's preliminary determinations would be based on information supplied to ITC by "38% of the relevant market." Because Gallo produces "35–40% of domestic wines," thereby making Gallo "the largest player in the game," ITC's counsel claimed that with Gallo's data ITC would be basing its preliminary determinations on information supplied to it by roughly "75% of the relevant market." Gallo did not oppose ITC's contentions.

**14.** Because this opinion supplements and expands upon the October 10, 1985 bench ruling, the Court has the luxury of a "Monday Morning Quarterback's" perspective: on October 17, one week after the Court ruled to the day that Gallo had to comply *in toto* with ITC's subpoena, ITC notified the Court by praecipe that Gallo had already "fully complied" with the subpoena, so that further enforcement proceedings would not be necessary. *See supra* note 3.

**15.** In fairness to Gallo, the Court acknowledges that Gallo's "suggestions" of the oppressive and burdensome nature of ITC's subpoena are supported to some extent by statements made in the affidavit of Louis Friedman, Vice-President/Treasurer of Gallo.

fect on Gallo's business that Gallo asserts it will.[16] Nevertheless, although "[t]ime must be taken from normal activities and resources must be committed to gathering the information necessary to comply ... [,] the presumption is that compliance should be enforced to further ... [an] agency's legitimate inquiry into matters of public interest." *Shaffner*, 626 F.2d at 38. In this case, the Court will not frustrate the performance by ITC of its legislatively assigned and specified responsibilities. *See SEC v. Savage*, 513 F.2d 188, 189 (7th Cir.1975) (per curiam).

---

**16.** *See supra* notes 3 and 14. The Court acknowledges Gallo's fear about a possible leak of its business and financial information; however, ITC is statutorily obligated to maintain the confidentiality of said information. *See* 19 U.S.C. § 1677(a)(4)(A) and (b)(1) (confidential information not to be disclosed by ITC to anyone but ITC or United States Customs Service personnel without consent of person submitting information, unless it can be disclosed in form "which cannot be associated with, or otherwise be used to identify, operations of a particular person"). In any event, although a district court may lighten the burden of an administrative subpoena by issuing a protective order, *Dow Chemical*, 672 F.2d at 1277 (citations omitted), where a respondent's fear concerns the possible dissemination of confidential information, "[a]t least until the subpoenaed information has been made available to the agency and it has had an opportunity to rule on specific requests for confidential treatment, such a protective order is premature and improper." *Texaco*, 555 F.2d at 884.