**WELLS MANUFACTURING COMPANY, Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Perfilados Tupy, S.A., Fundicao Tupy, S.A., and Tupy American Foundry Corp., Defendant–Intervenors.**

**Court No. 84–02–00193.**

United States Court of International Trade.

Dec. 8, 1987.

Michael H. Hall (Michael H. Hall, Washington, D.C., on the motion), for plaintiff.

Lyn M. Schlitt, General Counsel, U.S. Intern. Trade Comm'n; Michael P. Mabile, Asst. General Counsel (Stephen A. McLaughlin, Washington, D.C., on the motion), for defendant.

Freeman, Wasserman & Schneider, (Bernard J. Babb, New York City, on the motion), for defendant-intervenors.

## MEMORANDUM OPINION

CARMAN, Judge:

Plaintiff, Wells Manufacturing Company (Wells) commenced this action pursuant to section 516A(a)(1)(C) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(1)(C) (1982). Wells seeks judicial review of the preliminary negative determination by the International Trade Commission (ITC or Commission) in *Iron Bars From Brazil*, Inv. No. 701–TA–208, USITC Pub. No. 1472 (December, 1983).

Plaintiff contends the ITC incorrectly found neither a reasonable indication of material injury nor a reasonable indication of threat of material injury. In the plaintiff's view, the determination was based upon incomplete and inaccurate information provided to the ITC by its staff, upon inadequate consideration of the facts of the case, and upon grounds prohibited by the legislative history of the countervailing duty law. Plaintiff requests this Court remand the determination to the ITC with directions that it make and publish a determination of reasonable indication of material injury and threat of material injury. In the alternative, Wells requests a remand for redetermination of whether there is a reasonable indication of material injury or threat of material injury with directions as to the ITC's treatment of the issues and facts raised in this motion and requiring that the parties be given an opportunity to present such additional information as may be relevant and material.

In opposition, the ITC defends its determination asserting that there is a rational basis in the record to support the determination. The ITC contends it properly ap-

plied the reasonable indication standard when it evaluated all the evidence in the record and found no reasonable indication of material injury or threat thereof. The defendant-intervenors take the position that there is no evidence in the record of a reasonable indication of material injury or threat of material injury. The intervenors request the Court sustain the determination since it is supported by a rational basis in fact and was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

On review of the determination and the facts supporting it, the Court finds the determination was neither arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The determination of the ITC is therefore sustained, and the plaintiff's motion is denied.

### FACTS

On November 15, 1983, Wells Manufacturing Company, a U.S. producer of continuous-cast iron bars,[1] filed a petition with the Department of Commerce (Commerce) and the ITC. Wells alleged that a domestic industry was materially injured or threatened with material injury by reason of imports of continuous-cast iron bars from Brazil upon which "bounties or grants" had been bestowed.

Pursuant to section 703(a) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1671b, the ITC instituted a preliminary countervailing duty investigation. As part of the investigation, the ITC distributed questionnaires to the domestic producers, distributors, and importers of the subject merchandise.

On December 9, 1983, the ITC held a public staff conference at which interested parties were permitted to present testimony and respond to questions from the ITC staff. Following the conference, the par-

ties submitted post-conference briefs. A staff report discussing the relevant data accumulated during the investigation was then submitted to the ITC. The ITC subsequently found "[o]n the basis of the record developed in the subject investigation ... that there is no reasonable indication that an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports from Brazil of continuous-cast iron bars...." *Iron Bars From Brazil, supra,* at 1 (footnote omitted).

The ITC based its determination principally on the overwhelming domination of the domestic industry by Wells and Shenango Company (Shenango), the absence of any clear pattern of underselling by the imports, indications that most sales lost to imports were due to reasons other than price, and the refusal of domestic producers to deal with a distributor which subsequently sought the imports. *Id.* at 3.

The ITC staff found that one Brazilian firm, Perfilados Tupy S.A. (TUPY) produces iron bars in Brazil. The ITC staff found that TUPY had continuous-cast machines for use in the production of iron bars but was unable to produce centerless-ground iron bars or bore iron tubes.

The staff also determined that TUPY was in the process of establishing American Iron & Alloys Corporation (AIA) as its sole U.S. distributor of iron bars. The ITC therefore determined that AIA was the primary importer of Brazilian continuous-cast iron bar.

AIA was incorporated in June, 1982 by Gary Griffin, the former head of the iron bar sales department of Wells Manufacturing Company. Although there is some dispute as to what transpired between AIA and Wells and Shenango, both Wells and Shenango refused to deal with AIA or set

---

1. Continuous-cast iron bars are provided for in items 606.97 and 657.09 of the Tariff Schedules of the United States (TSUS). In the preliminary determination, the ITC found that the like products in the investigation comprise iron bars manufactured by the continuous-cast process "which produces iron bars that are free of burned-on slag and sand; have a uniform sur-

face, density, and hardness; and are free from centerline shrinkage and internal porosity." *Iron Bars From Brazil, supra,* at 4 (footnotes omitted). The ITC also found that "[c]ontinuous-cast iron bars are used to manufacture a wide variety of components, primarily for the machine tool, agribusiness, and hydraulic-pneumatic industries." *Id.* (footnote omitted).

AIA up as a distributor. Part of the ITC's determination focuses upon this refusal to deal with AIA.

AIA has only one warehouse in Waukesha, Wisconsin and utilizes one distributor, J. Rubin & Company (Rubin). Because of the industry's practice of immediate shipment, and the 6 to 8 weeks needed for delivery from Brazil, AIA must maintain a large inventory. The ITC found that the absence of a nationwide network of distributors and warehouses hampered AIA's ability to compete outside of the Midwest region. In contrast, the ITC found, both Wells and Shenango have maintained a nationwide network of distributors to sell their products.

The ITC also found that iron bar distributors must cut the bar to length and into special shapes, as the customer requires. Thus, to supply orders in a timely manner, the distributors must stock various types of bars. Consequently, inventories in the industry are necessarily high.

Concerning the question of material injury, the ITC conclusively determined that the volume and timing of the imports do not provide a reasonable indication of a nexus between the imports and the condition of the domestic industry. During the period of investigation, the ITC found that the level of imports of iron bars as a share of U.S. consumption was not significant, the domestic industry supplied virtually the entire U.S. market, and further that imports entered the U.S. after the domestic industry had experienced most of its major sales decline.

With regard to threat of material injury, the ITC found that "[t]he imports' low U.S. market penetration combined with limited foreign production capacity fails [sic] to establish any reasonable indication of a threat of material injury." *Iron Bars From Brazil, supra*, at 7 (footnotes omitted). The ITC also considered the nature of inventory practices in the industry an important factor in evaluating the inventory data in the investigation.

## BACKGROUND

Before considering the merits of the arguments presented in this action, the Court finds it necessary to discuss the relevant statutory provisions. Section 703 of the Tariff Act of 1930, as added by the Trade Agreements Act of 1979, 19 U.S.C. § 1671b(a) (1980 & Supp.1985) provides the basic framework for a preliminary determination by the ITC of a reasonable indication of material injury or threat of material injury in a countervailing duty investigation. Utilizing the best information available to it at the time of the determination, the ITC must ascertain whether there is a reasonable indication that:

(1) an industry in the United States—

(A) is materially injured, or

(B) is threatened with material injury, or

(2) the establishment of an industry in the United States is materially retarded,

by reason of imports of the merchandise which is the subject of the investigation by the administering authority. If that determination is negative, the investigation shall be terminated.

*Id.* Material injury is defined as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1980 & Supp.1985).

In arriving at a determination under 19 U.S.C. § 1671b(a), the ITC is directed to consider the following factors, among others:

(i) the volume of imports of the merchandise which is the subject of the investigation,

(ii) the effect of imports of that merchandise on prices in the United States for like products, and

(iii) the impact of imports of such merchandise on domestic producers of like products.

19 U.S.C. § 1677(7)(B) (1980 & Supp.1985). Essential to this analysis are the following guidelines:

(C) **Evaluation of volume and of price effects.**—For purposes of subparagraph (B)—

(i) **Volume.**—In evaluating the volume of imports of merchandise, the

Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

(ii) **Price.**—In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—

(I) there has been significant price undercutting by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

(iii) **Impact on affected industry.**—In examining the impact on the affected industry, the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices, and

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

19 U.S.C. § 1677(7)(C) (1980 & Supp.1985).

If the ITC makes a negative determination as to whether there is a reasonable indication of material injury or threat of material injury, then review is available in this Court within 30 days after the date the determination is published in the Federal Register. *See* 19 U.S.C. § 1516a(a)(1)(C) (1980 & Supp.1985). The Court is bound to hold unlawful such a determination found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 19 U.S.C. § 1516a(b)(1)(A) (1980 & Supp.1985). With these provisions in mind, the Court turns to a discussion of the arguments made by the plaintiff in support of its motion for review on the record.

## DISCUSSION

Plaintiff contends that the report prepared by the ITC staff for the ITC (staff report) and the ITC's determination were strongly influenced by allegations of trade restrictive practices on the part of the domestic industry. According to the plaintiff, four claims made by the intervenors (respondents in the administrative proceedings) were accepted at face value by the staff and the ITC. Plaintiff asserts the ITC staff ignored information received during the investigation which negated the claims of trade restrictive practices and did not make this information available to the ITC. In short, plaintiff argues, the allegations were accepted "without questioning whether the allegations were supported or negated by other information obtained in the investigation, and without analysis as to justification for any actions actually taken." Plaintiff's Brief in Support of Plaintiff's Motion for Review on the Record at 8, *Wells Manufacturing Company v. United States,* Court No. 84–02–00193.

The first allegation that plaintiff contends was accepted at face value was that Wells refused to sell domestically-produced continuous cast iron bars to AIA. In this regard, Wells asserts the staff and the ITC incorrectly relied upon a statement made by Gary Griffin, the president of AIA. Plaintiff argues this statement contradicts another statement previously made by Mr. Griffin.

The second allegation made by the intervenors which plaintiff challenges concerns Shenango's refusal to sell to AIA. According to Wells, this refusal "establishes nothing more than Shenango's decision to not add Mr. Griffin as a distributor; Shenango already had an established line of distributorships, including a distributor in the region where Mr. Griffin established his business...." Plaintiff's Brief in Support of Plaintiff's Motion for Review on the Record, *supra,* at 11. Plaintiff also asserts that it is reasonable to believe that the

refusal to sell to AIA was made on valid business grounds.

The third allegation allegedly accepted at face value was that the termination of the distributorship of Casting Consultants, Inc. (CCI) by Shenango was evidence of an improper refusal to sell to AIA. In this regard, plaintiff argues that the staff and the ITC were influenced by CCI's initiation of legal action in the Wisconsin courts. In the plaintiff's view, the question of whether or not Shenango complied with Wisconsin statutes in terminating the distributorship was irrelevant in the investigation.

The final allegation regarding trade restrictive practices concerns the treatment of Rubin, a distributor of Brazilian iron bars. Plaintiff maintains the record does not support the allegation that Midwest Alloys, Wells' wholly owned distributor in the Chicago area, directly solicited business from Rubin's customers. Rubin alleged these customers comprised 90% of Rubin's business. In fact, plaintiff asserts, Rubin was attempting to take away one of Midwest Alloys' established customers.

The second argument made by plaintiff concerns the ITC's treatment of the four allegations. In this regard, plaintiff alleges that the ITC neglected to make a finding that the injury to plaintiff was caused by the trade restrictive practices. As such, plaintiff asserts, the ITC is prohibited from weighing any injury caused by those alleged practices against the injury caused by the imports. Plaintiff contends Congress has required that the ITC state its conclusions of fact and of law in making its determinations, and further that "factors such as trade restrictive practices be considered *only* when it is established that they, and not the imported merchandise, are the cause of the injury suffered by the domestic industry." Plaintiff's Brief in Support of Plaintiff's Motion for Review of the Record, *supra*, at 24–25. In other words, plaintiff argues, trade restrictive practices may be considered only when they are the *sole* cause of the injury. In the plaintiff's view, because the ITC weighed the injury caused by trade restrictive practices against the injury caused by

the imports, the determination was not in accordance with law. If allowed to stand, plaintiff argues, importers will be given immunity from application of the countervailing laws when domestic manufacturers refuse to sell to them.

As its third argument, plaintiff challenges the staff report's treatment of information regarding the question of material injury and threat of material injury to the domestic industry. Plaintiff maintains that the staff report fails to present a complete, fair, and accurate statement of information obtained in the investigation concerning the importers, domestic industry, profitability of the domestic industry, volume of imports from Brazil, prices of continuous-cast iron bars, data on lost sales, and data on lost revenue.

With regard to the importers, plaintiff contends the staff report ignored Tupy American Foundry Corporation (TAFCO), the United States sales representative for the Brazilian manufacturer. Plaintiff also alleges that Quaker City Castings, Inc. (Quaker) was erroneously included within the domestic industry in the staff report. In the plaintiff's view, Quaker is an importer of continuous-cast iron bars and should be excluded from the domestic industry under 19 U.S.C. § 1677(4)(B).

With regard to the profitability of the domestic industry, plaintiff asserts that the staff report fails to present an analysis of profitability and sales volume of the domestic industry. In the plaintiff's view, reduced profitability of the industry was due in large part to inadequate return on sales not to reduced sales levels. This inadequate return, plaintiff asserts, was caused by increased expenses and the availability of inexpensive Brazilian imports.

Plaintiff alleges that the staff, at the direction of the Commissioner took the unprecedented and unjustified action of adjusting imports for inventories. According to the plaintiff, an adjustment of imports for inventories constitutes abnormal methodology and violates 19 U.S.C. § 1677(7)(C) which requires consideration of "the volume of imports of the merchandise," not a

figure adjusted so as to reduce the apparent effect of imports.

In the staff report, the prices of AIA are compared with those of both manufacturers and distributors of the domestically produced merchandise. Plaintiff maintains that the only prices which can meaningfully be compared with the prices of domestic producers are those prices reported by TAFCO. According to the plaintiff, AIA's prices should be compared only with the prices of other distributors. In other words, comparisons should be based on the relative positions in the distribution channel.

Plaintiff contends the staff report presented only what was described as "weighted-average" prices for the U.S. data, without explaining how the prices were weighted. Plaintiff also argues that the prices of the domestic product are distorted since these prices included volume discounts. As such, plaintiff asserts, the domestic prices are weighed in favor of the lowest (high-volume) prices, regardless of the sales volume of the Brazilian product with which the prices are compared. In essence, plaintiff argues, this distortion conceals the true pattern of underselling by the Brazilian product and affects the determination regarding the effects of this merchandise on the market for continuous-cast iron bar.

Plaintiff argues that the ITC staff interpreted the information on lost sales in the light most favorable to the Brazilian imports. Plaintiff also contends that additional information concerning lost sales which was made available to the ITC was ignored. More specifically, plaintiff contends that of the 12 firms contacted, nine reported purchasing Brazilian iron bars. According to the plaintiff, all of these purchases were made on the basis of price.

With regard to the information concerning lost revenues, plaintiff contends that the staff report does not accurately reflect the information obtained in the investigation concerning lost revenues and price suppression due to the Brazilian iron bars.

For its fourth argument, plaintiff contends that facts concerning the inability of the domestic producers and distributors to raise prices were not made available to the ITC in the staff report. According to the plaintiff, the domestic industry was unable to raise prices because of price undercutting of the Brazilian imports. As a result, plaintiff asserts, profitability of the domestic industry declined. In the plaintiff's view, the domestic industry's failure to raise prices was not evidence of strength as the ITC found but was rather evidence of an inability to raise prices due to the underpriced Brazilian imports. Plaintiff also argues that this lack of profitability to the domestic industry establishes the requisite nexus between the imports and the condition of the industry. Finally, plaintiff argues, although the ITC stated that the level of imports of iron bars from Brazil as a share of U.S. consumption was not significant, the manner in which the volume data was treated obscured the true relationship between imports and consumption.

In the plaintiff's view, "it was not the intent of Congress to '[make] relief more difficult to obtain for those industries facing difficulties from a variety of sources, *precisely those industries that are most vulnerable to subsidized or dumped imports.*'" Plaintiff's Brief in Support of Plaintiff's Motion for Review on the Record, *supra*, at 61 (citing H.R.Rep. 317, 96th Cong., 1st Sess. 47 (1979). Thus, plaintiff argues, the ITC should have found the domestic industry suffered material injury as a result of its inability to obtain reasonable profitability levels.

■ As previously discussed, a preliminary determination by the ITC must be sustained unless the Court finds the determination to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(A). This standard requires the following:

A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow

one...." The agency must articulate a "rational connection between the facts found and the choice made."

*Bowman Transportation v. Arkansas Best–Freight System,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (citation omitted). The Court must therefore determine whether or not there was a rational basis for the finding that there was no reasonable indication that the domestic industry producing continuous-cast iron bars was materially injured or threatened with material injury by reason of imports of continuous-cast iron bars from Brazil.

At the time the briefs in this case were filed, there was considerable controversy concerning the appropriate application of the reasonable indication standard. The controversy revolved around several decisions of this Court holding that the ITC may not weigh conflicting evidence in arriving at a preliminary determination. In the first of these cases, *Republic Steel Corp. v. United States,* 8 CIT 29, 591 F.Supp. 640 (1984), *reh'g denied,* 9 CIT 100 (1985), this Court remanded to the ITC two determinations in countervailing duty investigations because the ITC had weighed conflicting evidence in reaching a negative preliminary determination. This Court ruled that "[t]he object of these determinations should have been simply to find whether there were any facts which raised the possibility of injury. The resolution or interpretation of conflicting facts should have been reserved for a possible final injury determination." 8 CIT at 40, 591 F.Supp. at 650 (emphasis omitted). *See also Jeannette Sheet Glass Corp. v. United States,* 9 CIT 154, 160, 607 F.Supp. 123, 129 (1985), *appeal dismissed,* 803 F.2d 1576 (Fed.Cir. 1986), *vacated in part,* 11 CIT ——, 654 F.Supp. 179 (1987) ("[T]he 'reasonable indication' standard applicable to the Commission's preliminary investigations ... was intended by Congress to be administered as a very low evidentiary threshold for an affirmative preliminary determination...."); *American Grape Growers v. United States,* 9 CIT 396, 615 F.Supp. 603 (1985); *Armstrong Rubber Co. v. United States,* 9 CIT 403, 614 F.Supp. 1252 (1985).

The controversy was resolved, however, by the decision of the United States Court of Appeals for the Federal Circuit in *American Lamb Company v. United States,* 9 CIT 260, 611 F.Supp. 979 (1985), *rev'd,* 785 F.2d 994 (Fed.Cir.1986). *American Lamb* involved an appeal of a decision of this Court which remanded to the ITC a preliminary negative determination in an antidumping duty investigation. In the investigation, the ITC weighed all the evidence bearing on the issue of injury and determined there was no reasonable indication that the domestic lamb industry was being materially injured, being threatened with material injury, or that an industry in the United States was being materially retarded. This Court ruled that "in a preliminary investigation, the Commission's responsibility is simply to find whether any facts reasonably raise the *possibility* of injury." 9 CIT at 262, 611 F.Supp. at 980 (emphasis supplied).

The Court of Appeals ruled that the "mere possibility" standard articulated by the lower court was unacceptable in view of the requirement that "[a] reviewing court must accord substantial weight to an agency's interpretation of a statute it administers." 785 F.2d at 1001 (citations omitted). The Court of Appeals found that the statutory phrase "reasonable indication" did not mean the same thing as mere possibility and that the ITC's weighing of evidence was consistent with the intent of Congress. As the Court of Appeals succinctly stated:

> A series of factors—Congress' requirement that ITC conduct a thorough investigation, using the best information available to it, Congress' expectation of opportunity for interested parties to present their views, and Congress' provision of the "reasonable indication" standard for use in investigations initiated in response to a petition and in ITC's self-initiated investigations—all militate against a view that Congress intended ITC to disregard evidence that clearly and convincingly refutes the allegations in a petition.

785 F.2d at 1003. The Court of Appeals noted that the governing standard for re-

view of an ITC preliminary negative determination is an inappropriate basis for reversing the determination. The Court explained: "[w]hether the court might find it more difficult to overturn a negative preliminary determination when ITC had weighed conflicting evidence cannot be a factor in evaluating the permissibility of ITC's method of determining the presence or absence of a 'reasonable indication' of injury or threat of injury." 785 F.2d at 1004.

■ Turning now to the facts of this case, the Court finds there was a rational basis in the record for the ITC's determination that there is no reasonable indication of material injury from the imports from Brazil. As stated above, the ITC is permitted to weigh the evidence bearing on the question of injury. In addition, the ITC may, and indeed must, consider all evidence presented which comprises the record, whether or not incorporated in the staff report. Thus, while plaintiff disagrees with the manner in which the data was presented in the staff report, the staff report is only one of the documents comprising the record considered by the ITC. Furthermore, the staff is not required to present the data in the light most favorable to the plaintiff. The staff is concerned solely with presenting a complete and accurate picture of the state of the domestic industry for a particular product or products.

■ In considering the evidence regarding material injury, the ITC in a preliminary determination is directed to make a thorough investigation based upon the best information available to it at the time of the determination. 785 F.2d at 1003 (citing with approval *Budd Co. Railway Division v. United States*, 1 CIT 67, 71, 507 F.Supp. 997, 1000 (1980)). The ITC may consider, among other factors, trade restrictive practices. H.R.Rep. No. 317, 96th Cong. 1st Sess. 47 (1979); 19 C.F.R. § 207.27. Therefore, it was clearly reasonable for the ITC to have considered such

practices in making its determination. As the determination clearly provides, moreover, evidence of trade restrictive practices was only one of the factors considered by the ITC. *Iron Bars From Brazil, supra,* at 1. The determination provides that "[t]he *record* fails to establish the requisite causal link between the imports under investigation and the performance of the domestic industry." *Id.* at 5 (emphasis supplied). Furthermore, although there appears to be an inconsistency in the evidence regarding trade restrictive practices by Wells, the fact remains that Wells and Midwest Alloys refused to sell to AIA. List No. 1 of the Administrative Record, Doc. 26 at A–9, *Wells Manufacturing Company v. United States,* Court No. 84–02–00193. This refusal induced AIA to purchase the imported bars. The same conclusion is warranted with regard to Shenango whether or not Shenango had valid business grounds for its refusal to deal with AIA. With respect to Shenango's revocation of the distributorship with CCI, the Court finds this factor was not material in the ITC's determination. The determination was based on the refusals by both Wells and Shenango to deal with AIA. *Iron Bars From Brazil, supra,* at 7. The revocation was mentioned only briefly in a footnote. Finally, it is not clear why the determination would have been different had these practices not been considered or had otherwise been considered in a different manner.[2]

In the discussion regarding the causal link between the imports and the condition of the domestic industry, the ITC pointed out that the volume and timing of imports failed to provide a "reasonable indication of a nexus" between these factors. *Iron Bars From Brazil, supra,* at 5. The ITC found that throughout the period under investigation, the domestic industry supplied virtually the entire U.S. market, and the level of imports of iron bars as a share of U.S. consumption was not significant. The ITC also found that while net sales and

---

2. It is interesting to note that Chairman Eckes "d[id] not join in the discussion regarding refusal to sell because it ha[d] no bearing on his determination in this phase of the investigation." *Iron Bars From Brazil, supra,* at 6 n. 25.

profitability of the industry declined consistently from 1980 to 1982, remaining depressed in the interim period of 1983, the imports from Brazil entered in late 1982, "after the domestic industry had experienced most of its major sales decline." *Id.* at 6. Furthermore, there was evidence in the record that the presence of Brazilian imports did not have a price suppressing effect. For example, plaintiff admitted at the ITC conference that it has consistently followed a practice of price restraint even during periods of high inflation. Doc. 13 at 11. Thus although plaintiff urges the ITC should have found that lack of profitability was due to the Brazilian imports, there was a rational basis in fact for the ITC to find otherwise.

With regard to the pricing comparisons made by the ITC, plaintiff contends the staff report erroneously contains a comparison of AIA's prices with those of domestic producers. According to the plaintiff, price comparisons must be based on the relative level in the distribution channel. Although this assertion seems correct, the ITC's approach in this regard was reasonable. The staff report contains a comparison of AIA's prices with prices of both U.S. producers and distributors. *See* List No. 2 of the Administrative Record, Conf.Doc. 5 at A–27—A–23, *Wells Manufacturing Company v. United States,* Court No. 84–02–00193. Thus, the ITC was presented with the information plaintiff contends the ITC should have considered.

Plaintiff asserts that volume discounts skewed the data in favor of the importers. The chief sales manager of Wells testified, however, that "[t]here is basically no significant difference between what we would charge a distributor or a direct account and what we charge a large volume account.... We don't have a lot of discounting policies or situation-type pricing policies." Doc. 13 at 62. Plaintiff's own testimony therefore contradicts its argument that volume discounts granted by the domestic industry skewed the pricing data in favor of the importers.

■ Plaintiff argues that the inclusion of Quaker within the domestic industry dis-torts the true picture of the condition of the domestic industry. Additionally plaintiff contends Quaker should not have been summarily dismissed from consideration as an importer. However, since the ITC found that Quaker had an insignificant share of the U.S. market, and TAFCO no longer ships directly to Quaker, the Court finds the ITC's treatment of Quaker was not clearly erroneous.

■ Concerning the question of whether or not TAFCO should have been considered an importer, the Court finds reasonable the ITC's determination that inclusion of TAFCO would have amounted to the double-counting of imports. As the ITC found that virtually all of TAFCO's shipments were destined for AIA, and the ITC calculated the amount of imports of AIA, there was a rational basis in fact for the ITC's treatment of TAFCO.

The ITC noted that instances of lost sales were not due to lower prices. The confirmed instances of lost sales and revenues resulting from lower priced imports involved only an insignificant volume of iron bars. Doc. 25 at 6. Furthermore, the ITC found that the largest lost sale was lost by Wells not because of lower priced imports, but because Wells was trying to bypass the purchaser and sell directly to one of the purchaser's customers. *See* Conf.Doc. 5 at A–35. The ITC also concluded that the difficulties experienced by the domestic industry were unrelated to imports from Brazil since they preceded the date these imports entered the U.S. market. *Iron Bars From Brazil, supra,* at 5–6. On the basis of these findings, the Court holds that there was a rational basis in the record for the determination that lost sales data failed to provide evidence of a causal relationship between Brazilian imports and the condition of the industry.

Regarding the issue of threat of material injury, Congress has directed that "[a]n ITC affirmative determination ... must be based upon information showing that the threat is real and injury is imminent, not a mere supposition or conjecture." S.Rep. No. 249, 96th Cong., 1st Sess. 88–89 (1979), U.S.Code Cong. & Admin.News 1978, pp.

381, 474, 475. *See also* H.R.Rep. No. 317, *supra*, at 47. To determine whether or not the threat is "real and the injury is imminent," the ITC must examine the following criteria:

> [D]emonstrable trends—for example, the rate of increase of the subsidized or dumped exports to the U.S. market, capacity in the exporting country to generate exports, the likelihood that such exports will be directed to the U.S. market taking into account the availability of other export markets, and the nature of the subsidy in question....

*Id.*

Accordingly, with respect to the ITC's determination of no reasonable indication of threat of material injury, plaintiff argues the staff report contains an inaccurate representation of Brazilian iron bar capacity. More specifically, plaintiff argues that the staff should not have calculated Brazilian iron bar capacity on the assumption that the producer operated a single rather than a double shift. According to Wells, the Brazilian manufacturer has capacity far in excess of apparent Brazilian requirements and few, if any, export markets other than the United States.

The ITC found, however, and the record shows that AIA does not have the capability to expand its market share of the United States to any significant degree. As the ITC found, AIA, now the sole distributor of Brazilian imports, has only one warehouse and one distributor. Both are located in the Midwest. Doc. 13 at 76–77; Conf.Doc. 5 at A–13. In comparison, Wells has 7 distributors and 16 warehousing locations. These locations are scattered throughout the country. Doc. 13 at 30. Because the costs of transporting individual shipments by AIA are higher than the costs of bulk shipments by Wells to local distributors, nationwide competition by AIA is extremely difficult. Furthermore, the Brazilian producer lacks the ability to make centerless-ground iron bars or bore iron tubes, two of the most profitable activities. Doc. 13 at 72.

The ITC also determined that AIA's sales represent an insignificant share of the domestic market. Thus, even if capacity figures were adjusted to account for double shifts, the Brazilian producer's limited ability to expand its share of the U.S. market precludes a finding of a reasonable indication of a threat of material injury.

Plaintiff also contends that the staff and the ITC failed to consider the alleged history of the Brazilian producer's unfair trade practices. As the defendant has argued, however, the question of whether or not subsidies have been conferred in other investigations is not probative in an injury determination.

Plaintiff argues, however, that Mr. Griffin, the president of AIA, and a prior employee of Wells, had obtained a wide knowledge of the domestic iron bar industry. According to plaintiff, this knowledge which was a competitive advantage facilitating rapid penetration of the U.S. market was not mentioned in either the staff report or the ITC's determination.

Also with regard to penetration levels, plaintiff contends that the ITC should not have adjusted import penetration figures for inventories. Plaintiff argues that the ITC should consider the rate of increase in the market penetration level as evidence of a threat of material injury.

On review of the record, however, and despite the alleged competitive advantage held by Mr. Griffin, the Court finds sufficient the ITC's determination that the insignificant volume of imports and their small market penetration precluded a finding of threat of material injury. As the defendant has argued, even the *increase* in the penetration level is far from threatening.

The ITC also determined that since the industry customarily maintains large inventories, an adjustment for inventories was appropriate. Because AIA entered the market in 1982, and initial shipments were used to establish this inventory, the ITC reasonably concluded that inclusion of the inventory held by AIA would have misrepresented AIA's actual sales data and distorted AIA's actual impact on the market.

## CONCLUSION

In view of the above, the Court holds that the ITC's determination, of no reasonable indication of material injury or threat of material injury, was neither "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 1516a(b)(1)(A).

Accordingly, plaintiff's motion is denied, and the determination is sustained.

## JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED, ADJUDGED, and DECREED that the plaintiff's motion for review on the record is denied; and it is further

ORDERED, ADJUDGED, and DECREED that the preliminary negative determination of the International Trade Commission in Iron Bars From Brazil, Inv. No. 701–TA–208, USITC Pub. No. 1472 (December, 1983) is affirmed. The action is dismissed.